2002-NMCA-083

51 P.3d 1164

**Verna MARTINEZ, Plaintiff–Appellee,**

v.

**NORTHERN RIO ARRIBA ELECTRIC COOPERATIVE, INC., Defendant–Appellant.**

**No. 21,773.**

Court of Appeals of New Mexico.

June 12, 2002.

Certiorari Denied, No. 27,585, July 31, 2002.

Mark E. Komer, Herrera, Long, Pound & Komer, P.A., Santa Fe, NM, for Appellant.

Paula G. Maynes, Miller, Stratvert & Torgerson, P.A., Santa Fe, NM, for Appellee.

## OPINION

BOSSON, Chief Judge.

{1} Verna Martinez, a retired Northern Rio Arriba Electric Cooperative, Inc. (NORA) employee, brought suit against her former employer, arguing that she was not adequately compensated for unused sick leave upon her retirement. NORA appeals from a judgment entered upon a jury verdict in Martinez's favor. NORA contends that the district court erred in permitting the jury to award Martinez compensatory damages for breach of an implied contract and emotional distress, and in entering judgment upon the jury award for punitive damages. We affirm the award of contract damages, but reverse the awards for emotional distress and punitive damages. We remand for verdict restructuring and recalculation of pre-judgment interest.

## BACKGROUND

{2} NORA is the electric utility cooperative for northern Rio Arriba county. Martinez worked for NORA for forty-four years, retiring in January 1994. Martinez began her employment at NORA in 1949 as an office clerk and cashier. At the time of her retirement, Martinez held the position of office manager and accountant. Because she took very little time off from work, Martinez accrued a large amount of sick leave, in excess of 2800 hours.

{3} A few days before Martinez retired, NORA's manager, Emery Maez, informed her that the compensation for her unused sick leave would be considerably less than she had expected. Martinez appealed the amount of her sick leave compensation, first to the personnel committee and then to NORA's Board of Trustees, but was unsuccessful.

{4} In 1995, Martinez filed a federal lawsuit for gender discrimination, claiming that she had been treated differently from a similarly situated male employee, and also raising several state law claims. The federal district court entered summary judgment for NORA on the gender discrimination claim and dismissed the state claims without prejudice.

{5} In March of 1997, Martinez filed a complaint in Rio Arriba County district court for her sick leave compensation, alleging three legal theories: breach of implied contract, prima facie tort, and constructive fraud. The case went to trial in June 2000. After denying NORA's motion for directed verdict, the court submitted all three theories of liability to the jury, along with instructions permitting the jury to award damages for breach of contract, emotional distress, and punitive damages.

{6} The jury found NORA liable on all three theories and then awarded three kinds of damages. As compensation for breach of implied contract, the jury awarded Martinez $38,183.18 for unpaid sick leave, representing the difference between the amount Martinez was actually paid for her sick leave and the amount she had expected to be paid. The jury also awarded emotional distress dam-

ages totaling $53,600 ($41,600 for general emotional distress, $9000 for psychological counseling, and $3000 for mileage to obtain counseling). The award of punitive damages proved more problematic. Instead of entering a dollar amount, the jury wrote on the verdict form, in the space provided for punitive damages, "[a]ll court costs and lawyer fees acquired over the last 6 years related to this case." The verdict form did not specify under which theory or theories the jury awarded each type of damages. Neither party objected to the form of the verdict.

{7} After the trial was concluded and the jury discharged, Martinez asked the court to award her attorney fees and costs based on the jury's undetermined award of punitive damages. She submitted a statement of all of her attorney fees and costs, including those accrued during her unsuccessful federal lawsuit, and also moved for pre-judgment interest. NORA opposed Martinez's motions and moved for judgment as a matter of law, or in the alternative for a new trial, arguing that the punitive damages verdict was a legal nullity.

{8} In response, the court set a hearing for August 2000, but the trial judge was unable to conduct the hearing due to a family emergency. Instead, another judge, acting as a substitute, canceled the hearing and issued a memorandum decision. That judge entered judgment for Martinez in the full amount of the jury verdict for contract damages and emotional distress, and added an award of $144,281.51 in attorney fees as punitive damages. The substitute judge also awarded $91,783.18 in pre-judgment interest.

## DISCUSSION

### Contract Damages

{9} NORA argues that the trial court erred in denying its motion for directed verdict and then submitting the implied contract claim to the jury. We treat NORA's argument as a challenge to the sufficiency of the evidence upon which the jury based its verdict. *See Gonzales v. N.M. Dep't of Health*, 2000-NMSC-029, ¶ 18, 129 N.M. 586, 11 P.3d 550 (stating that when a case has been fully tried on the merits, an appellate court reviews the record to determine whether the evidence is sufficient to support the jury's verdict, rather than assessing only the sufficiency of the prima facie case).

{10} We will affirm a verdict supported by substantial evidence, which we have defined as "such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). Accordingly, we review the evidence in the light most favorable to the verdict to determine, "not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177.

{11} Focusing on the sufficiency of the evidence, the question before us is not whether NORA had an obligation to pay Martinez for unused sick leave; the parties do not dispute that NORA undertook such a commitment. The sole question is how NORA should have calculated that compensation, and specifically whether substantial evidence supports the jury's determination of an implied contract between NORA and Martinez to calculate that compensation in the manner Martinez suggested at trial. We begin by examining the evidence in support of the verdict.

{12} A few days before Martinez retired, Maez informed her that the compensation for her unused sick leave would be $19,532.61, which was less than half of what she expected to receive. Maez presented Martinez with a chart that detailed her proposed sick leave compensation. According to Maez's chart, Martinez was to be paid for all of her 2845 sick leave hours, but only at the wage rates she was earning during the years of accrual. For example, sick leave accrued in 1949, when she was earning only 89 cents an hour, would be calculated at that low hourly rate. Martinez disagreed with Maez's proposal and appealed to NORA's personnel committee.

{13} The personnel committee, using a different method of calculation, arrived at a slightly lower figure: $19,313.87. The committee began its calculations by deducting 600 hours from the 2845 sick leave hours that

Martinez had accrued. The deduction was based on a 1986 change in sick leave policy that limited employee sick leave accrual to 600 hours and provided for the annual redemption of all excess hours (over 600) at a rate of one-half of an employee's base rate. The personnel committee calculated the hours that Martinez had accrued before 1986 at the wage rate she was earning in 1986. Sick leave earned after 1986 was calculated at the wage rate she was paid during the years those hours were accrued. Pursuant to the 1986 policy change, Martinez was to be paid for the eligible sick leave hours at one half of the applicable hourly rate. Martinez disagreed with the personnel committee's method of calculation and filed a grievance with the NORA Board of Trustees, which ultimately agreed with the personnel committee and affirmed its decision.

{14} Martinez disagreed with the proposed calculations because, according to her testimony, she was exempt from the 1986 policy change and was to be compensated according to the previous policy in effect in 1980. Based on that 1980 policy and on representations made and implied by NORA personnel, Martinez argues that she should have been paid for all of her accrued sick leave hours, without any 600–hour limitation, and that she should have been paid at the full hourly rate she was earning at retirement, regardless of what she had been paid during the years of accrual. *See Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427, 773 P.2d 1231, 1234 (1989) (stating that the existence of an implied contract may be found in written or oral representations, in the conduct of the parties, or in a combination of representations and conduct). NORA denies that it ever made a sufficiently explicit promise to support Martinez's claim of implied contract. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672, 857 P.2d 776, 783 (1993) (holding that an offer or promise must be sufficiently explicit to give rise to reasonable expectations, in order to create an implied employment contract). Based on our review of the record, however, NORA's denial does not persuade us that the evidence was insufficient to support the jury verdict.

{15} Substantial evidence supports Martinez's claims about the 1980 sick leave policy. The NORA Board of Trustees adopted its first sick leave policy in that year. The 1980 policy provided that accrued sick leave would be paid out to those employees who stayed with NORA until retirement or death, but it would not be paid if an employee quit or was fired. The policy also stated that "[s]ick leave pay will be computed at the straight-time hourly rate[.]" A former Board member testified that the 1980 sick leave policy was adopted to discourage employees from taking unnecessary sick time, and to create an incentive for employees to build up a sick leave bank, to be used in the event of illness, or to be paid out upon retirement.

{16} In 1986, the Board of Trustees revised the sick leave policy, limiting sick leave accrual to 600 hours. At the end of each calendar year, time accumulated in excess of 600 hours was to be redeemed at one-half the employee's current base rate of pay. According to Martinez, however, she and two other longtime NORA employees with large sick leave accruals were exempted from the 1986 policy change. That claim to an exemption finds support in the record.

{17} NORA's former manager testified that certain employees with large amounts of sick leave accrual, including Martinez, had been "carved out" from the 1986 policy change, because of Board concerns about the cost of paying them at the end of that year for their excess accumulated sick leave. Former Board members also testified that the Board intended to "grandfather in" Martinez, and two other longtime employees, exempting them from the 600 hour sick leave cap.

{18} Notably, in the years after 1986 until her retirement, Martinez was never paid for sick leave that she had accumulated in excess of 600 hours, as the 1986 policy change required. Instead, contrary to the 1986 policy change, she continued to accrue sick leave totaling 2845 hours by the time of her retirement. Although Martinez administered the payroll, NORA's former manager never objected to the continued accrual of Martinez's sick leave.

{19} Narciso Rendon, another longtime NORA employee with a large accumulation of sick leave, was also exempted from the 1986 policy change. Retiring a few years before Martinez, Rendon was paid for all of his unused sick leave at his current hourly rate. Rendon left work in 1988, but remained on the payroll for an additional five months, drawing from his accrued sick leave balance, at which point the remaining balance was redeemed in full at his current pay rate. Both NORA's former manager and the Board were aware of how Rendon was compensated for his sick leave at retirement and did not object. Martinez testified that she had fully expected to be paid in the same manner as Rendon, and she alerted Maez to her expectation. Martinez also testified that, about two years before she retired, Maez directed her to start accruing money in a special account for the purposes of paying her upon retirement. Although Maez told Martinez that he thought Rendon had been overpaid, he did not, prior to Martinez's last week of employment, inform her that her sick leave would not be redeemed, as she anticipated, in the same way that Rendon's sick leave had been redeemed. In response to Martinez's queries about her sick leave redemption, Maez told her that NORA would pay it "as it does any other bill." Martinez was not informed that she would not be paid in the manner she expected until a few days before she retired.

{20} Based on the representations and conduct of various NORA personnel, a reasonable jury could have agreed with Martinez's expectation that she would be paid for all of her sick leave, at her full current base rate, just as Rendon had been. *See Hartbarger,* 115 N.M. at 671, 857 P.2d at 782; *Newberry,* 108 N.M. at 427, 773 P.2d at 1234. Substantial evidence supports the jury's determination that NORA breached its implied contract with Martinez, as well as the jury's award of contract damages based upon that reasonable expectation.

## Emotional Distress Damages

{21} NORA argues that the trial court erred, as a matter of law, in permitting recovery for emotional distress damages. Such an award, NORA contends, cannot be supported by any of the three theories advanced by Martinez: implied contract, prima facie tort, and constructive fraud. We discuss each of those theories, in turn, to determine whether they can support an award of emotional distress damages. For the reasons that follow, we do not find support in any of the three possible theories, and therefore, we conclude that emotional distress damages should not have been submitted to the jury.

## Breach of Implied Contract

{22} As a general rule, "damages for emotional distress are not recoverable in an action for breach of an employment contract, whether express or implied, in the absence of a showing that the parties contemplated such damages at the time the contract was made." *Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp.,* 106 N.M. 19, 20, 738 P.2d 513, 514 (1987) (stating that the purpose, in an action for breach of an employment contract, is to restore to the plaintiff what was lost by the breach). NORA relies on that general rule to strike the award of emotional distress damages in this case.

{23} Martinez refers us to *Flores v. Baca,* 117 N.M. 306, 871 P.2d 962 (1994), involving a breach of contract with a funeral home, for the proposition that emotional distress damages are allowable when "peace of mind" is an implied part of the contract. *Id.* at 311, 871 P.2d at 967 (holding that surviving family members may be implied-in-fact intended beneficiaries of funeral and burial contracts). We are not persuaded that *Flores* is applicable to the situation at hand. The very object of a funeral contract is to provide peace of mind to grieving survivors. *Id.* While it is true that an employee might derive some peace of mind from receiving compensation for unused sick time, we remain unpersuaded that peace of mind was an implied part of this particular contract, such that the parties could have "contemplated such [emotional distress] damages at the time the contract was made." *Silva,* 106 N.M. at 20, 738 P.2d at 514. If we were to allow emotional distress awards in a garden-variety employment contract case, we would

undercut the fundamental limitation on awards for contractual breach; namely, what is reasonably within the contemplation of the parties to the contract. We will not let the rare exception illustrated in *Flores* swallow the general rule.

### Prima Facie Tort

{24} Martinez contends, in the alternative, that the award of emotional distress damages can be sustained on the basis of her jury award for prima facie tort. New Mexico first recognized a cause of action for prima facie tort in *Schmitz v. Smentowski,* 109 N.M. 386, 393–94, 785 P.2d 726, 733–34 (1990). Prima facie tort is intended to provide a remedy for persons harmed by intentional and malicious, but otherwise lawful, acts that "fall outside of the rigid traditional intentional tort categories." *Id.* at 394, 785 P.2d at 734. Prima facie tort should be used to address wrongs that otherwise "escape[ ] categorization," *id.* at 396, 785 P.2d at 736, but "should not be used to evade stringent requirements of other established doctrines of law," *id.* at 398, 785 P.2d at 738.

{25} Notably, Martinez did not bring a claim for intentional infliction of emotional distress. Nor did she present evidence of extreme and outrageous conduct on the part of NORA. *See Stock v. Grantham,* 1998–NMCA–081, ¶¶ 38–39, 125 N.M. 564, 964 P.2d 125 (holding that a prima facie tort claim may not be used as a means of avoiding the more stringent requirements of the tort of intentional infliction of emotional distress which requires extreme and outrageous conduct).

{26} Because not every intentionally caused harm gives rise to an actionable tort, we apply a balancing test to determine whether there is a cause of action under prima facie tort theory. *Beavers v. Johnson Controls World Serv., Inc.,* 120 N.M. 343, 348, 901 P.2d 761, 766 (Ct.App.1995); *Schmitz,* 109 N.M. at 394, 785 P.2d at 734. The activity complained of must be balanced against both its justification and the severity of the injury, weighing the injury, the culpable character of the conduct, and whether the conduct is justifiable under the circumstances. *Schmitz,* 109 N.M. at 394, 785 P.2d at 734.

{27} Martinez relies on *Beavers,* to support her prima facie tort claim. Accordingly, we examine that case, in some detail, noting the vivid contrast between the facts in *Beavers* and the case at hand. In *Beavers,* 120 N.M. at 345–47, 901 P.2d at 763–65, the plaintiff's supervisor knew of her sensitivity and, nevertheless, embarked on a course of conduct intended to humiliate, belittle, and create a hostile work environment for her, forcing her to resign or seek a transfer. The supervisor persisted in ridiculing and disparaging the plaintiff, even after receiving written notice that she had been hospitalized for work-related stress. *Id.* at 347, 901 P.2d at 765.

{28} After performing the requisite balancing test, we concluded in *Beavers* that the supervisor's conduct was unjustified, furthered no legitimate business interest, and that the means he used were "outside the ambit of legitimate employer behavior." *Id.* at 350, 901 P.2d at 768; *see also id.* at 348–50, 901 P.2d at 766–68 (balancing the nature and seriousness of the harm, the nature and significance of the actor's conduct, the character of the means used, and the actor's motives). We determined that the plaintiff had established a claim of prima facie tort, although the defendant's conduct fell outside the perimeters of an action for intentional infliction of emotional distress. *Id.* at 352, 901 P.2d at 770. The unusual facts in *Beavers* were analogous, under statutory employment law, to a claim of constructive discharge due to a hostile work environment, which led us to recognize a claim for prima facie tort. *See id.* at 351, 901 P.2d at 769. The case at hand, however, presents no such facts, nor anything similar in terms of hostile and malicious behavior.

{29} Martinez's allegations can be summarized in a few brief statements. She argues that Maez deliberately concealed from her his plan to shortchange her sick leave compensation. She became upset and accused Maez of harassing her when he tried to speak with her about his opinion that Rendon had been overpaid. Martinez also characterizes part of the personnel committee meeting

as "secret," because she was not invited to stay while the committee completed its review of the relevant company policies, made calculations, and readjusted the amount of her sick leave redemption. Additionally, she contends that she was being retaliated against for asserting her rights because Maez wrote two memos related to her performance, even though she was unaware of this documentation prior to her retirement and suffered no adverse employment consequences as a result. Martinez also speaks of feeling "humiliated" that NORA hosted a retirement party for her and that Maez spoke glowingly of her at the party, although she also testified that at the time she thought his speech was "very nice." Martinez also presented a great deal of testimony, including expert opinion, regarding how emotionally difficult it had been for her to not receive what she felt she deserved from her longtime employer.

{30} We are not persuaded that any of these allegations, or all of them taken together, rise to the level of both behavior and injury that is envisioned by the theory of prima facie tort. *See Beavers*, 120 N.M. at 349, 901 P.2d at 767 (balancing test begins by determining the nature and seriousness of the harm caused). NORA's conduct had some justification as it related to the furthering of a legitimate business interest. *Cf. id.* at 350, 901 P.2d at 768 (examining the nature and significance of the actor's conduct). The means used were not "outside the ambit of legitimate employer behavior." *Cf. id.* (discussing character of the means used). The evidence does not support the view that NORA "acted maliciously with the intent to cause the injury and without sufficient justification." *Cf. id.* (discussing the actor's motive). The emotional difficulty that Martinez experienced because of NORA's actions does not, on balance, support a claim for prima facie tort. *See id.* at 349–51, 901 P.2d at 767–69; *see also Stock*, 1998–NMCA–081, ¶¶ 38–39, 125 N.M. 564, 964 P.2d 125 (holding that the plaintiff's prima facie tort claim duplicated other claims and could not be used to evade the more stringent proof requirements of other causes of action).

{31} We hold that Martinez did not have an actionable claim for prima facie tort, and the court committed error, as a matter of law, by submitting the claim to the jury. Thus, her claim for prima facie tort cannot support the award of damages for emotional distress.

### Constructive Fraud

{32} Martinez does not provide any authority, nor are we aware of any authority, for the proposition that constructive fraud can support either emotional distress damages or punitive damages. Therefore, we do not consider constructive fraud a viable theory to justify any such award.

### Punitive Damages

{33} During its deliberation, the jury submitted a question to the court asking whether, instead of placing a dollar value on punitive damages, the jury could just state "lawyers fees, court and medical costs." The trial court, with the approval of counsel for both parties, provided no answer to the jury's question. On the verdict form, instead of entering a dollar amount for punitive damages, the jury wrote, "[a]ll court costs and lawyer fees acquired over the last 6 years related to this case." When the jury returned its verdict, neither party objected to the manner in which the jury purported to award punitive damages, and the jury was discharged.

{34} Martinez relies on *Thompson Drilling, Inc. v. Romig*, 105 N.M. 701, 703, 736 P.2d 979, 981 (1987), for the proposition that the jury's verdict was proper, even if the jury did not enter a dollar amount. In *Thompson*, our Supreme Court upheld an award of monetary damages that included the words "+ Gross Receipt[s] Tax." *Id.* at 702, 736 P.2d at 980. The applicable gross receipts tax was apparent from a bill that had been introduced into evidence. *Id.* at 703, 736 P.2d at 981. Similarly, Martinez argues that the trial court applied a "mere mathematical calculation" to give effect to the jury's intent. *Id.* (internal quotation marks and citation omitted).

{35} We disagree. The amount of tax at issue in *Thompson* was easily discernible by

reference to the record. In the present case, however, the jury had no such evidence of legal fees and costs incurred by Martinez. The jury had no idea, at least no idea based upon the evidence presented at trial, of the amount of punitive damages they might be awarding. *Cf. id.*

{36} The general rule is that "[a] valid judgment cannot be entered on a jury verdict which is neither specific nor definite as to the damages awarded." *Sanchez v. Martinez*, 99 N.M. 66, 71, 653 P.2d 897, 902 (Ct.App.1982). The verdict should leave no question as to the clear intent of the jury to award a specific amount. *Id.* at 72, 653 P.2d at 903. "Defects in a verdict which render it indefinite or insufficient invalidate the verdict form unless corrected by the jury following further deliberations." *Id.*

{37} In this case, Martinez accepted a verdict that was a legal nullity. *See Thompson Drilling, Inc.*, 105 N.M. at 703, 736 P.2d at 981 (stating that the right to object to an improper verdict is waived when not made at the return of the verdict and cannot be reclaimed by resorting to a motion for a new trial or on appeal); *Ettenson v. Burke*, 2001–NMCA–003, ¶ 28, 130 N.M. 67, 17 P.3d 440 (reversing a portion of the verdict, which was a legal nullity because it was rendered without the necessary legal foundation); *see also Bldg. Structures, Inc. v. Young*, 328 Or. 100, 968 P.2d 1287, 1291–92 (1998) (holding that plaintiff's failure to make such a request, while the jury was still empaneled, waived the insufficiency or irregularity of the verdict and precluded the granting of a new trial); *Langton v. Int'l Transp., Inc.*, 26 Utah 2d 452, 491 P.2d 1211, 1214 (1971) (same). Accordingly, the trial court erred when it entered judgment on the award of punitive damages, and that portion of the judgment must be reversed.

**NORA's Request for a New Trial**

{38} NORA argues that, if any of Martinez's liability claims survive this appeal, NORA is entitled to a new trial due to the admission of prejudicial evidence related to any claims that we are now determining should not have been submitted to the jury. For example, NORA argues that the evidence admitted to prove Martinez's claim of emotional distress could have played on the sympathies of the jury and influenced the jury unfairly to award damages for breach of contract.

{39} We note, however, that the special verdict form required the jury to differentiate between each of the claims raised by Martinez and to delineate the damages awarded. A jury is presumed to follow the court's instructions to consider evidence for one purpose but not another. *Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999–NMCA–070, ¶ 40, 127 N.M. 397, 981 P.2d 1215. Accordingly, we will assume that the jury followed the court's instructions and appropriately gave separate consideration to each claim for relief and each amount of damages awarded. NORA is not entitled to a new trial.

**CONCLUSION**

{40} The award of contract damages is affirmed, all other damages are reversed, and we remand for verdict restructuring and a recalculation of pre-judgment interest.

{41} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and MICHAEL D. BUSTAMANTE, Judges.