2005-NMCA-024

107 P.3d 520

**Glen BOGLE d/b/a Bogle Realty and French & French, Inc., a New Mexico Corporation, Plaintiffs–Appellees,**

v.

**SUMMIT INVESTMENT COMPANY, LLC, and Jeffery W. Potter, Defendants–Appellants.**

No. 23,686.

Court of Appeals of New Mexico.

Jan. 5, 2005.

84

Eric M. Sommer, Sommer, Udall, Hardwick, Ahern & Hyatt, LLP, Santa Fe, NM, for Appellees.

Martin S. Friedlander, Law Offices of Martin S. Friedlander, Los Angeles, CA, Jeffrey L. Baker, Baker Law Firm, Albuquerque, NM, for Appellants.

## OPINION

BUSTAMANTE, Judge.

{1} This is a dispute over a commission on the sale of real property. Defendants, Summit Investment Company, LLC (Summit), and Jeffery W. Potter, appeal a judgment, entered after a bench trial, in favor of Plaintiff French & French, Inc. (French). The judgment awarded compensatory and punitive damages and held Summit and Potter jointly and severally liable. Leaving implications of the numerous issues sought to be raised by Defendants to the body of the Opinion, we: (1) affirm the award of compensatory damages against Summit, (2) reverse the judgment against Potter in his individual capacity, and (3) affirm the award of punitive damages against Summit.

## BACKGROUND

{2} The district court found the following facts. In early December 1998, Santa Fe Economic Development, Inc. (SFEDI) listed certain property it owned with a real estate broker called Santa Fe Properties (the listing broker). SFEDI agreed to pay the listing broker a 10% real estate commission, plus gross receipts tax, half of which would be paid to any licensed real estate broker who found a buyer for the property. In the fall of 1998, Potter, general manager and sole shareholder of Summit, had enlisted Plaintiff Glen Bogle's services to find property Summit could buy for commercial development. Summit engaged Bogle to represent it in the purchase of the SFEDI property. Bogle never entered into an agency agreement with Summit, Potter, or SFEDI. Thus there was no written agreement obligating anyone to pay Bogle a commission on the transaction. In any event, Bogle was not able to negotiate the purchase, and in mid-December 1998 Summit terminated its business relationship with Bogle.[1]

{3} At the end of December 1998, Summit contacted French to act as a buyer's agent in the purchase of the same property. On behalf of Summit, Potter executed a form "Buyer's Agency" agreement with French. French prepared the form to run from December 1, 1998, until June 1, 1999. Summit attempted by interlineation to limit the term of the agreement to January 31, 1999. The district court found that French did not agree to this limitation, and that the term of the agreement "was not affected by Potter's interlineation." Summit and French also entered into a "Buyer's Agency Disclosure and Compensation Agreement" (Compensation Agreement). The Compensation Agreement required SFEDI, as seller, to authorize the listing broker to pay French a 5% commission, plus gross receipts tax, in the event of a sale. The Compensation Agreement recited that it was to be attached to any purchase agreement covering property that was not listed by French where French was acting as the buyer's broker.

{4} Following signature of the two agreements, French proceeded to facilitate negotiations with SFEDI to produce a purchase agreement. During the last week of negotiations, SFEDI informed Potter and Summit that it would require them to indemnify SFEDI from any claims for compensation

---

1. Bogle was a Plaintiff at the trial in district court. The district court ruled he was not enti-tled to any recovery. He did not appeal the ruling and he is not a party here.

that Bogle might make. With the exception of Potter agreeing to personally indemnify SFEDI, all essential terms and conditions of the purchase agreement were agreed to by January 29, 1999. The district court found that SFEDI did not demand that French join in indemnifying it from Bogle's demands. This finding is supported by the testimony of SFEDI's attorney who confirmed that all drafts of the purchase agreement required Summit to indemnify SFEDI while none required French to do so, and that SFEDI never otherwise demanded French indemnify it. There was testimony that Potter and Summit requested that French also indemnify SFEDI. French refused to do so. The district court specifically found that French's refusal to indemnify SFEDI had no material effect on the negotiations between SFEDI and Summit because SFEDI never requested that French indemnify it.

{5} After French refused to indemnify SFEDI, Summit's counsel authorized French to arrange a meeting with Bogle to negotiate a resolution of Bogle's claim to commission. French arranged a meeting with Bogle, but before the meeting occurred, Summit's counsel told French not to meet with Bogle because Potter had agreed to indemnify SFEDI and Summit and SFEDI had signed the purchase agreement. Summit informed French it would not be paid a commission on the sale. Rather, Summit replaced French, was named the buyer's broker in the final purchase agreement, and the commission was paid to Summit.

{6} The district court found that Summit and Potter "interfered with and prevented" French from acting as agent and performing its obligations under the Buyer's Agency agreement "thereby breaching Summit's obligations un [sic] the contract." The district court decided that the Buyer's Agency agreement and the Compensation Agreement constituted a statutorily enforceable agency agreement, and that French was a procuring cause of the sale of the SFEDI property. The district court ruled that Summit was liable to French "for deliberately executing a purchase contract with SFEDI that did not require payment" of a commission to French.

The district court also entered the following findings of fact:

3. Santa Fe Economic Development, Inc. (SFEDI) is a nonprofit New Mexico corporation.

4. Summit Investment Company, LLC (Summit) is a limited liability company.

5. Jeffery W. Potter (Potter) is a resident of Santa Fe County, New Mexico and is a licensed real estate broker under the laws of the State of New Mexico. He is the manager of Summit.

6. Santa Fe Properties, Inc. (Santa Fe Properties) [the listing broker] is engaged in the sale and purchase of real estate under the laws of the state of New Mexico.

7. SFEDI was the owner of approximately 21.44 acres of land located in Santa Fe County, which land is part of the Valdez Center.

. . . .

9. Under the listing agreement, SFEDI agreed to pay Santa Fe Properties [the listing broker] a 10% real estate commission, plus gross receipts tax thereon, of which half (5%) would be paid to any licensed real estate broker who brought a purchaser who purchased the lots at Valdez Center from SFEDI.

10. In the fall of 1998, Potter, in his capacity as General Manager of Summit, enlisted Bogle's services to find Summit real estate could purchase for commercial development.

11. Bogle showed and introduced Potter to various commercial properties, including SFEDI's lots.

12. After being introduced to SFEDI's properties, Potter informed Bogle that Summit wanted to purchase SFEDI's lots.

13. Summit engaged Bogle to represent it in the sale of the Valdez Center lots.

14. On December 3, 1998, Summit, through Potter, asked and authorized Bogle to submit a letter of intent to purchase the SFEDI property, expressly acknowledging that Bogle was

making the offer as Buyer's Agent for Summit.

15. Bogle never entered into a Broker's Agency Agreement with Summit or Potter.

16. No written agency agreement was ever executed between Bogle and SFEDI, wherein SFEDI was obligated to pay Bogle a commission.

## DISCUSSION

{7} Defendants raise thirteen issues on appeal, which we have classified into three categories for the purposes of our discussion: contract issues, tort issues, and punitive damages. We address each one in turn.

## BREACH OF CONTRACT

■ {8} Defendants first argue that no contract existed between Summit and French because there was no mutual assent as to the termination date of the contract, and without mutual assent, no contract was ever formed. We deal with this argument summarily because Summit did not raise these issues at trial, and they have not been preserved for appeal. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App. 1987) (noting preservation requirements). Defendants actually made the opposite argument below. Defendants requested the following findings of fact:

18. At the end of December 1998, Summit executed a Buyer's Agency Disclosure Statement and Compensation Agreement and Buyer's Agency Right to Represent Buyer Agreement . . . with French, . . .

. . . .

22. The Agreement set forth a termination date of January 31, 1999.

Defendants' argument during trial mirrored their requested findings of fact. Defendants may not change their "theory on appeal" and now claim that no contract existed. *See Azar v. Prudential Ins. Co.,* 2003–NMCA–062, ¶ 24, 133 N.M. 669, 68 P.3d 909 (internal quotation marks and citation omitted).

{9} Defendants next argue that if there was a contract between French and Summit, no breach occurred because the contract expired on January 31, 1999, four days before they entered into a purchase agreement with SFEDI. In the same vein, Defendants argue that the district court erred in allowing parol evidence to be admitted regarding the end date of the contract, and "rewriting" the terms of the contract to make the end date June 1, 1999.

■ {10} The question whether a contract contains an ambiguity is a matter of law to be determined by the district court. *Mark V, Inc. v. Mellekas,* 114 N.M. 778, 781–82, 845 P.2d 1232, 1235–36 (1993). The meaning of an ambiguous term is a question of fact which we review under a substantial evidence standard. *Id.* Appellate courts are not bound by the district court's conclusions of law, but its findings of fact are reviewed under a substantial evidence standard. *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 510, 817 P.2d 238, 244 (1991) "[I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." *C.R. Anthony Co.,* 112 N.M. at 508–09, 817 P.2d at 242–43 (footnote omitted). In adopting this rule, New Mexico courts have abandoned the "plain-meaning" or "four-corners" standard that required courts to resolve the ambiguity without any outside evidence. *Mark V, Inc.,* 114 N.M. at 781, 845 P.2d at 1235.

■ {11} Based on our holdings in *C.R. Anthony* and *Mark V, Inc.,* the district court correctly heard evidence surrounding the making of the Buyer's Agency agreement to resolve the ambiguity concerning its term. The district court relied on the testimony of French's agent, who testified it was customary practice for the length of a Buyer's Agency agreement to extend six months to a year, that he did not agree to Potter's handwritten expiration date, and that to do so in a complicated transaction such as this would be unreasonable. The district court also relied on the fact that Summit authorized French to continue to perform under the Buyer's Agency agreement as late as February 4, 1999, after the claimed expiration date. All of these facts support the district court's deci-

sion that the term of the agreement ran through June 1, 1999.

{12} In a rather odd argument, Defendants assert that even if there was a contract in force, Summit as the buyer had no personal obligation according to the terms of the contract to pay French any commission. Rather, Defendants claim, SFEDI as seller had the obligation to pay the broker's commission. We characterize this argument as odd given the basic nature of the arrangement between Summit and French.

{13} French concedes (and says it never argued otherwise) that Summit did not have a direct obligation to pay the commission. French points out that the agreement between it and Summit contained both implied and express promises that the purchase agreement between Summit and SFEDI would assure payment of the commission to French by the listing broker. French argues, and the district court ruled, that Summit breached these promises. As noted above, French and Summit executed two documents. The Buyer's Agency agreement gave French the right and authority to represent Summit in locating and acquiring real property. The Compensation Agreement—executed simultaneously with the Buyer's Agency agreement—was designed to protect, if not insure, payment of the buyer's (Summit) broker's commission. The Compensation Agreement obligated Summit to make the Compensation Agreement an exhibit to any purchase agreement Summit entered into as a buyer. Paragraph 4(b) of the Compensation Agreement required sellers (such as SFEDI) to agree to have the following terms in any purchase agreement:

b. Seller authorizes and directs Listing Broker to share its commission with Broker, acting as a Licensee, in accordance with the division shown in the listing information offered through MLS or Broker shall be compensated on the following terms: Five percent of sales price plus applicable New Mexico gross receipts tax. Broker shall not receive any undisclosed real estate brokerage commission in this transaction. Payment of said commission to Broker shall not create any agency or subagency relationship between Broker and either Seller or Listing Broker.

Together, the two documents described how French would earn its commission and how it would be paid from the sales proceeds. Thus, Summit's argument that it had no direct obligation to pay the commission is literally beside the point, and we reject it.

{14} Summit's only factual defense of its action was that French in effect bowed out of the transaction when it refused to indemnify SFEDI. Once that defense was rejected as a factual matter, the district court's decision could—and did—rest on a number of legal theories. For example, Summit breached an express term of the agreement when it failed to have the Compensation Agreement attached to the purchase agreement with SFEDI.

{15} In addition, in real estate transactions, the law implies certain promises between a buyer and a broker even if the commission is to be paid by the seller, as in this case. French cites to a number of out-of-state cases for the proposition that a real estate broker has a cause of action against a purchaser who refuses to carry out his contract with the seller, even though the broker has agreed to look to the seller for his commission. *See generally Probst v. Di Giovanni,* 232 La. 811, 95 So.2d 321 (1957); *Blache v. Goodier,* 22 So.2d 82 (La.App.1945); *Tanner Assocs., Inc. v. Ciraldo,* 33 N.J. 51, 161 A.2d 725 (1960); *Duross Co. v. Evans,* 22 A.D.2d 573, 257 N.Y.S.2d 674 (N.Y.App.Div. 1965); *Danciger Oil & Ref. Co. v. Wayman,* 169 Okla. 534, 37 P.2d 976 (1934); and *Livermore v. Crane,* 26 Wash. 529, 67 P. 221 (1901). The general rule derived from these cases is that a purchaser is liable to a broker for breach of an implied promise when the purchaser fails to complete the transaction. Here, the district court found that Summit failed to complete the transaction with French as its broker for no good reason.

{16} Perhaps more familiarly, the district court found a breach of the duty of good faith and fair dealing. "[E]very contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Watson Truck & Supply Co. v. Males,* 111 N.M. 57, 60, 801 P.2d 639, 642

(1990); *Gilmore v. Duderstadt*, 1998–NMCA–086, ¶ 24, 125 N.M. 330, 961 P.2d 175. This implied covenant requires that neither party do anything that will injure the rights of the other party to receive the benefit of the agreement. *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852, 856 (1994). Having found that SFEDI never demanded indemnification from French, the district court clearly decided there was no excuse for Summit's behavior in excluding French from the transaction. The district court implicitly decided that Summit simply tried to force French to accept a risk which was not part of the original arrangement between them. The district court was clearly struck—as are we—by the fact that Summit itself took the commission. All of these circumstances support the district court's ruling.

{17} Finally, Defendants argue that the district court erred by finding Potter individually liable for breach of contract. The short answer is that it did not. The district court's basis for Potter's individual liability was in tort.

**TORT CLAIMS**

{18} We read the district court's rulings to hold only Potter, and not Summit liable for intentional interference with French's contract and for prima facie tort. Therefore, we do not address any tort liability of Summit under either of these theories. Relying on California and Texas case law, Defendants argue that Potter, as manager for Summit, cannot interfere with Summit's contracts. This Court addressed the issue of a corporate officer interfering with the contracts of his own corporation in *Ettenson v. Burke*, 2001–NMCA–003, 130 N.M. 67, 17 P.3d 440. In *Ettenson*, we rejected the view that "corporate officers are simply surrogates of the corporation, entitled to absolute immunity from suits for tortious interference with contract." *Id.* ¶ 20. We held instead that the privileged immunity of corporate officers is qualified. *Id.* Corporate agents "are privileged to interfere with or induce breach of the corporation's contracts with others as long as their actions are in good faith and for the best interests of the corporation." *Id.* ¶ 18. We recognized in *Ettenson* that the inquiry of whether or not a privilege exists is fact specific, to be determined by the trier of fact. *Id.* ¶¶ 18, 19, 21. In determining whether or not a privilege exists, the district court must look to the motivating forces behind the agent's decision to induce the corporation to breach its contractual obligations. *Id.* ¶ 18. A court cannot say as a matter of law that a corporate agent was not acting in the best interest of the corporation by interfering with its contractual duties simply because, as in this case, the agent may have stood to profit along with the corporation. *Id.* ¶ 21. In addition, under New Mexico's Limited Liability Company Act, NMSA 1978, §§ 53–19–1 to –13 (1993, as amended through 2004) and supporting case law, an agent of a corporation may be held liable for the consequences of his own acts or omissions, including tortious acts. *Kreischer v. Armijo*, 118 N.M. 671, 673, 884 P.2d 827, 829 (Ct.App.1994) (recognizing that an agent may be held individually liable for his own tortious acts, whether or not he was acting for a disclosed principal).

{19} As a matter of law, therefore, it is possible in New Mexico for a corporate agent to wrongfully interfere with his corporation's contracts and to be held personally responsible for his acts. The question then becomes whether or not Potter could be held liable under the facts of this case.

{20} To establish liability, French had the burden of showing that (1) Potter had " 'knowledge of the contract' " between French and Summit, (2) "performance of the contract was refused," (3) Potter " 'played an active and substantial part in causing [French] to lose the benefits of [the] contract,' " (4) "damages flowed from the breached contract," and (5) Potter "induced the breach 'without justification or privilege to do so.' " *Ettenson*, 2001–NMCA–003, ¶ 14, 130 N.M. 67, 17 P.3d 440 (quoting *Wolf v. Perry*, 65 N.M. 457, 461–62, 339 P.2d 679, 681–82 (1959)).

{21} To find Potter individually liable, the facts must show that Potter acted with either an improper motive or by use of improper means. *See Diversey Corp. v.*

*Chem-Source Corp.,* 1998–NMCA–112, ¶ 20, 125 N.M. 748, 965 P.2d 332. Improper means includes not only tortious behavior, but any "predatory" behavior, including behavior that is wrongful based on an established standard of a trade or profession. *Id.* ¶ 21. The district court found Potter's motive in interfering with the contract was for the improper purpose of diverting a commission away from French to himself and Summit. What is lacking, though, is any evidence establishing how Potter's motives were separate from those of Summit. The district court did not find that Potter's improper purpose in diverting the commission was for his own benefit, rather than that of Summit. In this case, Summit profited from the diverted commission. The findings do not support a legal conclusion that Potter acted with an improper personal or individual motive. We hold that the evidence was not sufficient to support a claim for intentional interference with the contract against Potter individually. We therefore reverse the decision of the district court on this issue.

{22} Having determined that the record does not support a claim for intentional interference with contract, we now address the district court's ruling that Potter was "individually liable ... because his acts and omission satisf[ied] the elements of a prima facie tort." To state a claim for prima facie tort, French had to show (1) "[a]n intentional, lawful act by defendant;" (2) "[a]n intent to injure the plaintiff;" (3) "[i]njury to plaintiff, and" (4) "insufficient justification for the defendant's acts." *Schmitz v. Smentowski,* 109 N.M. 386, 393–94, 785 P.2d 726, 733–34 (1990) (citation omitted). Prima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which "fall outside of the rigid traditional intentional tort categories." *Martinez v. N. Rio Arriba Elec. Coop., Inc.,* 2002–NMCA–083, ¶ 24, 132 N.M. 510, 51 P.3d 1164 (internal quotation marks and citation omitted). Prima facie tort should be used to address wrongs that otherwise "escaped categorization," but "should not be used to evade stringent requirements of other established doctrines of law." *Schmitz,* 109 N.M. at 396, 398, 785 P.2d at 736, 738.

{23} New Mexico courts have accepted the view that prima facie tort may be pleaded in the alternative. *See id.* "[H]owever, if at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted ... on that cause and not under prima facie tort." *Id.* at 396, 785 P.2d at 736. Using this procedure, the theory underlying prima facie tort, (which is to provide a remedy for intentionally committed acts that do not fit within the contours of accepted torts), may be furthered, while remaining consistent with modern pleading practice. *Hagebak v. Stone,* 2003–NMCA–007, ¶ 26, 133 N.M. 75, 61 P.3d 201 (internal quotation marks and citation omitted).

{24} Although French was unable to establish a claim under intentional interference with contract, that was the appropriate tort action in this case. In addition, Plaintiff had a (successful) cause of action under breach of contract. Thus, existing causes of action provided reasonable avenues to a remedy for the asserted wrongful conduct. As such, there was simply no need to resort to prima facie tort. This is a classic case of a plaintiff trying to avoid "stringent requirements of other established doctrines of law" to impose liability in tort. *Schmitz,* 109 N.M. at 398, 785 P.2d at 738. Prima facie tort has no application here.

## PUNITIVE DAMAGES

{25} Defendants argue that the district court violated the United States Constitution by holding both Potter and Summit liable for punitive damages. Defendants contend that the district court failed to make several determinations that are required to uphold a finding of punitive damages, including Defendants' reprehensibility, whether the harm was physical or economic, whether the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others, and whether the conduct involved repeated actions or was an isolated incident. We first address the district court's decision to award punitive damages, then the reasonableness of the award.

{26} Plaintiff contends the district court had substantial evidence to conclude that Potter's acts were willful and in reckless disregard of French's right to a commission. Plaintiff further alleges that Potter's stated pretext for taking French out of the sales transaction and stepping in as the buyer's broker predicated on the false claim that SFEDI demanded indemnity from French is evidence of dishonesty or deceit, and will support an award of punitive damages in a case of malicious breach of contract. *Constr. Contracting & Mgmt., Inc. v. McConnell,* 112 N.M. 371, 375, 815 P.2d 1161, 1165 (1991).

{27} Since we have reversed the district court on the issue of Potter's individual tort liability, we also reverse as to any punitive damages awarded against Potter. We only review the punitive damages based on the breach of contract action against Summit.

{28} New Mexico law allows a plaintiff who establishes a cause of action in law to recover punitive damages as long as the wrongdoer's conduct is willful, wanton, malicious, reckless, oppressive, or fraudulent and in bad faith. *Sanchez v. Clayton,* 117 N.M. 761, 767, 877 P.2d 567, 573 (1994); *Gonzales v. Sansoy,* 103 N.M. 127, 129, 703 P.2d 904, 906 (Ct.App.1984). Contrary to Defendants' contention that punitive damages cannot be awarded in breach of contract cases, our case law clearly establishes that punitive damages may be recovered for breach of contract when the defendant's conduct has been sufficiently malicious, oppressive, fraudulent, or committed recklessly with a wanton disregard for the plaintiff's rights. *Paiz v. State Farm Fire & Cas. Co.,* 118 N.M. 203, 210, 880 P.2d 300, 307 (1994). An award of punitive damages for breach of contract may be sustained on appeal only if the evidence shows a culpable state of mind. *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.,* 1999–NMSC–006, ¶ 45, 127 N.M. 1, 976 P.2d 1. "Our rule on punitive damages never was intended to make punitive damages available for every intentional breach of a contract." *Romero v. Mervyn's,* 109 N.M. 249, 256, 784 P.2d 992, 999 (1989). An intentional breach by itself ordinarily cannot form the predicate for punitive damages, not even when the breach is flagrant, that is, when

there is no question that the conduct breaches the contract, even if the other party will clearly be injured by the breach. *Cafeteria Operators, L.P. v. Coronado–Santa Fe Assocs., L.P.,* 1998–NMCA–005, ¶ 43, 124 N.M. 440, 952 P.2d 435 (Hartz, C.J., concurring in part and dissenting in part). Circumstances which could make punitive damages appropriate in a breach of contract case include, for example, an intentional breach accompanied by fraud. *See, e.g., Whitehead v. Allen,* 63 N.M. 63, 65–66, 313 P.2d 335, 336 (1957) (affirming a punitive damages award for the falsification of weight records by purchaser of alfalfa).

{29} Also, when the breaching party intends to inflict harm on the non-breaching party or engages in conduct which violates community standards of decency, punitive damages are appropriate. *McConnell,* 112 N.M. at 375, 815 P.2d at 1165. *See Romero v. Mervyn's,* 109 N.M. 249, 258, 784 P.2d 992, 1001 (1989) ("Overreaching, malicious, or wanton conduct" justifying punitive damages "is inconsistent with legitimate business interests, violates community standards of decency, and tends to undermine the stability of expectations essential to contractual relationships."). "Malicious conduct is the intentional doing of a wrongful act with knowledge that the act was wrongful." UJI 13–861, NMRA. *See Romero* at 255–56, 784 P.2d at 998–99 ("[M]alice ... means the intentional doing of a wrongful act without just cause or excuse. This means that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it.") (quoting *Loucks v. Albuquerque Nat'l Bank,* 76 N.M. 735, 747, 418 P.2d 191, 199 (1966)); UJI 13–1827, NMRA (giving same definition for malicious conduct in tort cases to justify punitive damages).

{30} Using this analysis, the question is whether Summit's breach of contract with French was sufficiently egregious to merit punitive damages. The district court found Summit had full knowledge that French was entitled to its commission and that it entered into the purchase agreement with SFEDI with the intention of depriving French of its due. The district court also found that Sum-

mit's conduct was not justifiable under all the circumstances and that it was motivated by an improper purpose to divert the commission to itself. The district court did not enter any specific finding that Potter or Summit acted dishonestly or deceitfully.

 {31} As discussed above, every intentional breach can be seen as a wrongful act that the breaching party knows will cause financial harm to the other party. Thus, the fact that Summit knew French was entitled to the commission is not enough to support an award of punitive damages.

 {32} Do the lack of justification and improper purpose or motive to divert the commission provide the added level of egregiousness sufficient to support punitive damages? We hold that they do. While not strictly dishonest, Summit's actions were, as the district court found, without justification. Summit found itself faced with a potential claim from Bogle. SFEDI demanded protection from Bogle's claim. Summit's potential difficulties with Bogle were none of French's doing or business. Yet Summit purposely took French's commission for itself to cover its own risk. Summit tried to make French pay for business risks which were Summit's alone. This cannot be viewed as a legitimate business reason for an intentional breach. Rather Summit's acts and motive fits the standard for malicious conduct. The basis for punitive damages was established.

 {33} The amount of the damages also seems reasonable. The Eighth and Fourteenth Amendments to the federal Constitution prohibit punitive damage awards that are "grossly excessive." *Cooper Indus. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 433–34, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). We review an award of punitive damages for excessiveness de novo. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.,* 2002–NMSC–021, ¶ 17, 132 N.M. 401, 49 P.3d 662. Our review must consider three guideposts: "1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the harm . . . suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* ¶ 20 (citing *BMW,* 517 U.S. at 574–75, 116 S.Ct. 1589).

 {34} An award of punitive damages "should reflect the enormity of [the] offense." *BMW,* 517 U.S. at 575, 116 S.Ct. 1589 (internal quotation marks and citation omitted). To determine the reprehensibility of the defendant's misconduct, we must consider whether

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co.,* 538 U.S. at 419, 123 S.Ct. 1513. Although the presence of any of these factors alone may not be sufficient to support an award of punitive damages, the "absence of all of them renders any award suspect." *Id.* The only factor weighing in favor of an award of punitive damages in this case is the fact that the harm inflicted by Summit was the result of intentional malice. However, we find that this factor is sufficient to support an award of punitive damages. Punitive damages are "intended to punish the defendant and to deter future wrongdoing." *Cooper Indus.,* 532 U.S. at 432, 121 S.Ct. 1678. Absent an award of punitive damages in this case, Summit would have no incentive to refrain from cheating those with whom it does business in the future. Therefore, we find that Summit's conduct was sufficiently reprehensible to support the relatively modest punitive damages award imposed by the district court.

{35} The second *BMW* guidepost requires us to consider whether the "amount of [the] award [is] so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Aken,* 2002–NMSC–021, ¶ 23. This is a somewhat imprecise inquiry; the United States Supreme Court has refused to establish a "bright-line ratio which a punitive damages award cannot exceed." *State Farm Mut. Auto. Ins. Co.,* 538 U.S. at 425,

**92**

123 S.Ct. 1513. However, the Court has recognized that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* In this case, the district court imposed a relatively modest punitive damage award equal to one and one-half times the compensatory damages award. Based on the general lack of guidance on what constitutes an appropriate ratio between compensatory and punitive damages and the relatively small ratio in this case, we find that the amount of punitive damages awarded by the district court did not violate due process.

{36} The third guidepost requires us to "[compare] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *Aken*, 2002–NMSC–021, ¶ 25 (quoting *BMW*, 517 U.S. at 583, 116 S.Ct. 1589). Under the Unfair Practices Act, NMSA 1978, § 57–12–1 to –24 (1967, as amended through 2004), it is unlawful for any person to make a "false or misleading oral or written statement, . . . or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . which may, tends to or does deceive or mislead any person." §§ 57–12–2(D), –3. Because of the similarity of the conduct prohibited by the Unfair Practices Act and the conduct engaged in by Summit, the remedies afforded under the Unfair Practices Act serve as a meaningful comparison in our determination of the reasonableness of the punitive damages awarded by the district court. Under the Unfair Practices Act, any person who suffers a financial loss as the result of another willfully engaging in an unfair trade practice may recover treble damages. § 57–12–10(B). Because the ratio of punitive damages to compensatory damages awarded by the district court was smaller than the statutory ratio for similar conduct, we find that the award of punitive damages was not excessive under this guidepost.

{37} Because we find that each of the three *BMW* guideposts supports the district court's award of punitive damages, we conclude that the amount of the award did not

violate due process. Therefore, we affirm the district court's award of punitive damages.

**CONCLUSION**

{38} We affirm the award of compensatory and punitive damages against Summit. We hold that the district court erred in finding Potter individually liable, and we reverse the judgment against him.

{39} **IT IS SO ORDERED.**

WE CONCUR: RODERICK T. KENNEDY and MICHAEL E. VIGIL, Judges.