## TERRITORY *v.* PRIDEMORE.

*(Supreme Court of New Mexico. January 29, 1887.)*

HOMICIDE—DEGREES OF MURDER—ERROR IN CHARGE—REVERSAL.

Where, on a trial for murder, the judge, in charging the jury, gives them a definition of murder in the fourth degree, and instructs them, by inadvertence, that such facts constitute murder in the *third* degree, and the jury so find, there being insufficient evidence to support a verdict of murder in the third degree, the judgment on such verdict will be reversed on appeal for the error in the charge, notwithstanding a correct definition of murder in the fourth degree, with the penalty, given in a subsequent part of the charge.

Appeal from district court, San Miguel county.

*Wm. Breeden,* Atty. Gen., for appellee. *Fiske & Warren,* for defendant.

HENDERSON, J. Appellant, Thomas Pridemore, was indicted for the murder of Robert S. Cochran, by the grand jury of San Miguel county. He was tried, and convicted of murder in the third degree, and his punishment fixed at nine years in the penitentiary. Numerous exceptions were taken during the progress of the trial, and properly saved by bill of exceptions.

Defendant moved for a new trial and in arrest of judgment. These motions were overruled, and the case brought here by appeal.

The facts may be stated, in general terms, as follows: On the evening of the twenty-fourth day of December, 1885, appellant, Pridemore, the witnesses Green, Coleman, Swearinger, deceased, (Cochran,) and one De Graftenried were on their way in a small wagon on the public highway to a dance in San Miguel county. Pridemore, Swearinger, and De Graftenried were on a seat in the front of the wagon; Cochran towards the hind end, sitting on the bed of the wagon; while Coleman and Green were in the back end. Green had his feet on the outside, hanging over the rear end of the wagon. Appellant was on the right side, and was driving the team. It was about 8 o'clock, and the night rather dark. All the men were drinking more or less. Coleman says he was drunk. Green had been drinking rather freely. At a point on the road, about an hour before the difficulty took place, Green had shot at a dog following a Mexican family passing in the opposite direction. At this, Pridemore, who seems to have been in charge of the party, and over whom he had control under their employment on the Lynch ranch, spoke to Green, saying "that if he didn't behave he would have to get out and walk." Just before the shooting took place, Green asked De Graftenried to give him a drink. There was a jug in the forepart of the wagon, in reach of De Graftenried, but at the request of appellant he declined to comply with the request. The request was repeated, but again denied, at which Green seems to have become angered, and replied in very indecent and offensive language. At this time appellant made some remarks to Green, but exactly what he did say the witnesses are not agreed. Either immediately after, or while appellant was addressing these remarks to Green, the firing began. Green says they (himself and appellant) fired at the same time. The shooting was kept up until four, five, or six shots in all were fired. Green says that the deceased was leaning against his back, facing to the front, while he was facing to the rear of the wagon. Coleman says the deceased was sitting on the bottom of the wagon, near the middle of the bed, facing to the front when the shooting began. Two shots fired by Green took effect,—one in the face, and the other in the back of the neck or head, of Pridemore. Swearinger testified that there were two bullet holes through the seat on which appellant, witness Swearinger, and

De Graftenried sat. This accounts for four shots from the rear end of the wagon. Green swears he fired but three shots,—two in the wagon, and one on the ground, after getting out. He also swears that he was shot once through his hat, and another in his coat-sleeve. This makes six shots. The shot that killed Cochran, this witness says, could not have been either of those passing through his hat or coat. It is certain that Cochran was killed by a pistol shot fired at that time. The deceased was directly between Green and appellant, according to Green's own statement, when he fired the last shot from the road; that is, deceased was in the bed of the wagon, between Pridemore and witness Green. Green says deceased undertook to get up when he fired the first shot, and that after that time he took no notice of him, for the reason that he had other business to attend to in watching the movements of appellant. Coleman says deceased was in the wagon when De Graftenried halted the team, and was wounded. Whether deceased was shot from the front or rear does not clearly appear from the evidence. Nor does it appear whether, when he attempted to get up, as Green says, he turned his body around. Some evidence was offered tending to prove that a Winchester rifle was also fired, as a Winchester shell was found near the spot where the difficulty arose. Neither Green nor Pridemore intended to shoot or in any manner injure Cochran. Pridemore swore that he did not fire at all. His pistol was found by Coleman with but one chamber empty, but with the appearance of a recent discharge out of that.

The sixth instruction given by the court to the jury is as follows: "The killing of a human being, without design to effect death, in heat of passion, but in a cruel and unusual manner, unless committed under such circumstances as to constitute justifiable or excusable homicide, is murder in the third degree. If such killing is done in the heat of passion, without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is justifiable or excusable, it is murder in the *third degree.* Every other killing of a human being in any other manner, by the act, procurement, or culpable negligence of another, where such killing is not justifiable or excusable, or is not murder in any one of the degrees defined, is murder in the fifth degree." The defendant at the time excepted to the giving of this and many other charges by the court, and he especially excepted to the giving of the second paragraph of the foregoing charge.

Appellant contends that it was a misdirection to the jury, to his prejudice, in this: that the court, in giving the second paragraph, defined the statutory offense of murder in the fourth and called it the third degree. The difference in the two degrees consists in this: in murder in the third degree, the killing, although, like the fourth, without a design to effect the death of the person killed, is not murder in such degree unless the killing is done in a cruel and unusual manner. In the fourth degree murder is committed by killing, without a design to effect death, with a dangerous or deadly weapon. It has no reference whatever to the *manner* of the killing except it must be by a dangerous or deadly weapon, and without legal justification or excuse.

The court in another instruction properly defined what murder in the fourth degree was, with the maximum and minimum penalty affixed. The maximum penalty for murder in the third degree is 10 years' imprisonment; that of murder in the fourth degree is seven years'. We think on this exception the only question to be considered is whether the additional correct charge covering murder in the fourth degree cured the error in the second paragraph of the sixth instruction. We think this may be determined by considering whether the evidence justified the jury in finding the defendant guilty of murder in the third degree. Was it a killing in a cruel and unusual manner without any design to effect death? It is conceded by the attorney general that the killing was accidental, whether committed by Pridemore or Green. Mr. Webster defines the word "cruel" as follows: "Disposed to give pain to others in body

or mind; willing or pleased to torment, vex, or afflict; inhuman; destitute of pity, compassion, or kindness; fierce; ferocious; savage; barbarous; hard-hearted; applied to persons, or their dispositions, exerted in tormenting, vexing, or afflicting." "Unusual" is by the same author defined to be "not usual; not common; rare; as an unusual season; a person of unusual grace or erudition."

We are of the opinion that the legislature intended, by the use of those terms, to employ them in their usual, literal, and obvious sense. While it would be a most cruel, inhuman, and barbarous thing to kill an innocent and wholly unoffending man if done intentionally, still no cruelty can be imputed to unintentional or accidental acts. Legal culpability can undoubtedly, because the safety of human life requires prudence, and a due degree of caution in doing acts, the effect of which may be dangerous to others. In such cases the law, as a measure of prudence and safety, imputes guilt. But to complete the crime of murder in the third degree there must be an intentional or well-directed motive in the actor to inflict pain, either to the body or mind of another. A general evil intent, fatally bent upon mischief, evincing deep depravity, would be sufficient, perhaps, to answer the purposes of the statute defining murder in the second degree. In the third, however, we think there must have been both the absence of the intention to kill and the presence of the motive to inflict bodily or mental suffering, from the effect of which the injured person died. Again, killing a human being by means of a shot or shots from a Colt's revolver is not, as the history of criminal trials shows, an unusual manner of effecting death. The evidence did not bring the offense within this degree. Whatever may be said by way of criticism of our statutes on the subject of homicide, and the great difficulty the judiciary may encounter in clearly applying the law to a given state of facts, and the freedom the criminal classes may enjoy from punishment, it is nevertheless our duty to ascertain and enforce, as nearly as we may, the laws we find upon the statute books. We may and do deplore the confusion, ambiguity, and patent defects in our penal system, yet that responsibility must rest upon the legislative branch of the government.

We therefore conclude that the jury found the facts defined in the fourth degree, and by reason of the inadvertence of the court in giving the second paragraph of the sixth instruction fixed the grade in the third degree. This was prejudicial to the prisoner, in this: the maximum penalty of the fourth degree is seven **years' imprisonment.** They assessed his punishment at nine years.

The court erred, and we cannot say that the giving of a further and correct instruction cured it. As the cause will be reversed, and a new trial granted, it will not be necessary to pass upon any other of the many alleged errors in the record.

Let the judgment of the court below be reversed, and the cause remanded, with directions to award appellant a new trial, and it is so ordered.

BRINKER, J.. concurs.