**Certiorari Granted, May 4, 2011, No. 32,939**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-039**

**Filing Date: March 9, 2011**

**Docket No. 29,092**

**UNITED NUCLEAR CORPORATION,**

     **Defendant/Third-Party Plaintiff/Appellant,**

**v.**

**ALLSTATE INSURANCE COMPANY,**

     **Third-Party Defendant/Appellee.**

**APPEAL FROM THE DISTRICT COURT OF McKINLEY COUNTY**
**Louis E. Depauli, Jr., District Judge**

Comeau, Maldegen, Templeman & Indall, LLP
Michael R. Comeau
Jon J. Indall
Stephen J. Lauer
Sharon W. Horndeski
Santa Fe, NM

McCarter & English, LLP
Arnold L. Natali, Jr.
J. Wylie Donald
Newark, NJ

for Appellant

Civerolo, Gralow, Hill & Curtis, P.A.
William P. Gralow
Lisa Entress Pullen
Albuquerque, NM

Nixon Peabody L.L.P.
Walter T. Johnson

1

San Francisco, CA

for Appellee

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Mark C. Meiering
Albuquerque, NM

Andrews Kurth LLP
Jerry L. Beane
Dallas, TX

for Amicus Curiae

**OPINION**

**CASTILLO, Chief Judge.**

**{1}**     The United Nuclear Corporation (UNC) was sued for discharging pollutants in the course of its mining operations.  Allstate Insurance Company (Allstate) provided UNC comprehensive liability insurance.  Under the policies Allstate issued UNC, property damage or personal injury caused by pollution was excluded from coverage, unless such pollution was "sudden and accidental."  The issue before us is whether the liabilities arising from UNC's pollution discharges are excluded or fall within the "sudden and accidental" exception to the exclusion.  We interpret the terms "sudden" and "accidental" by their plain and ordinary meanings and conclude that the liabilities for which UNC sought coverage are excluded because the pollution discharges that gave rise to those liabilities were neither sudden nor accidental.  The district court's decision granting Allstate's motion for partial summary judgment is affirmed.

**I.     BACKGROUND**

**{2}**     UNC operated a number of mines in New Mexico in the 1970s and 1980s.  To protect itself from liabilities arising from its mining operations, UNC purchased umbrella liability insurance policies from two former subsidiaries of Allstate, both of which are now defunct.  Allstate is the successor-in-interest to those policies.

**{3}**     The Allstate policies provide indemnity "for damages on account of . . . Personal Injuries . . . [and] Property Damage . . . caused by or arising out of each Occurrence happening anywhere in the world."  Each policy also includes a "qualified pollution exclusion" stating that the policy shall not apply

> to Personal Injury or Property Damage arising out of the discharge, dispersal,

2

release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]

{4}     This case commenced when Santa Fe Pacific Gold, a mineral lessor at one of UNC's mines, sued UNC for environmental damages. UNC sought indemnification from Allstate under the Allstate policies. Allstate denied coverage. UNC then filed a third-party complaint in district court asking for a declaratory judgment determining Allstate's duty to defend and indemnify.

{5}     In response, Allstate moved for partial summary judgment. Allstate argued that UNC's claims were barred under the qualified pollution exclusion clause because its claims were for personal injury or property damage arising out of pollution discharges. Allstate acknowledged that the "sudden and accidental" exception to the qualified pollution exclusion clause could restore UNC's coverage, but asserted that coverage could be restored under this exception only if UNC's pollution discharges were both "sudden and accidental." Allstate asked the district court to interpret "sudden" as meaning "'quick,' 'abrupt' or otherwise a temporarily short period of time" and to define "accidental" as meaning "unintended, unexpected, or by chance." So defined, Allstate claimed that coverage could not be restored as UNC's pollution discharges were part of UNC's regular business practices, occurred over the course of many years, and, thus, were not sudden.

{6}     UNC opposed Allstate's partial motion for summary judgment and argued that there are disputed material questions of fact regarding the meaning of the terms in the Allstate policies and that there is a dispute regarding the expectations of the parties concerning pollution coverage under the policies. UNC further argued that the term "sudden" should be interpreted to mean "unintended" or "unexpected" and argued that the exception to the qualified pollution exclusion clause should be interpreted to cover gradually occurring pollution events. In the alternative, UNC argued that the term "sudden" should be deemed ambiguous.

{7}     The district court concluded that the terms "sudden" and "accidental" are unambiguous, and should be given their plain meanings. Adopting Allstate's proposed definitions, the district court determined that "'sudden' means quick, abrupt or otherwise a temporarily short period of time" and that "'accidental' means unintended, unexpected[,] or by chance." As authority for its decision, the district court relied on *Mesa Oil, Inc. v. Insurance Company of North America*, 123 F.3d 1333, 1339-41 (10th Cir. 1997). Having construed the disputed terms, the district court then concluded that coverage was excluded, that coverage was not restored by the "sudden and accidental" exception in light of the nature of the pollution discharges, and dismissed UNC's third party complaint with prejudice. UNC appeals.

## II.     DISCUSSION

3

**{8}** On appeal, UNC makes the same arguments it presented to the district court. First, it argues that the district court erred in defining the term "sudden" by its ordinary meaning and asks us to vacate the district court's order on partial summary judgment and hold that the term "sudden" has no temporal connotation. In the alternative, UNC argues that the term "sudden" is ambiguous and, thus, summary judgment was precluded. UNC next argues that Allstate is estopped from asserting that the Allstate policies do not cover gradually occurring environmental liabilities. UNC then argues that the district court improperly ruled on factual matters outside the scope of Allstate's partial motion for summary judgment. Finally, UNC argues that the district court's order deprived UNC of a fair hearing on Allstate's duty to defend. We address each argument in turn.

## A. Standard of Review

**{9}** "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. The material facts in this case are not in dispute. We review legal conclusions below under a de novo standard. *Id.*; *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 60, 123 N.M. 752, 945 P.2d 970 ("The interpretation of an insurance contract is a matter of law about which the court has the final word.").

## B. Interpretation of the Term "Sudden"

**{10}** UNC argues that the district court improperly interpreted the term "sudden" in the "sudden and accidental" provision. According to UNC, the term "sudden" does not mean quick, abrupt, or otherwise a temporarily short period of time. Rather, UNC claims, the term should be defined as having no temporal connotation and is synonymous with the term "unexpected." As support for this contention, UNC relies on extrinsic evidence in the summary judgment record regarding the insurance industry's statements concerning the meaning of the term and what UNC refers to as the drafting history of the qualified pollution exclusion clause.

**{11}** "[I]nsurance contracts are construed by the same principles which govern the interpretation of all contracts." *Rummel*, 1997-NMSC-041, ¶ 19 (internal quotation marks and citation omitted). Our primary goal when interpreting contract provisions is to ascertain "the intentions of the contracting parties with respect to the challenged terms at the time they executed the contract." *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 11, 129 N.M. 698, 12 P.3d 960 (internal quotation marks and citation omitted). "When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties." *Id.* (internal quotation marks and citation omitted). "We consider the plain language of the relevant provisions, giving meaning and significance to each word or phrase within the context of the entire contract, as objective evidence of the parties' mutual expression of assent." *H-B-S P'ship v. Aircoa Hospitality Servs., Inc.*, 2005-NMCA-068, ¶ 19, 137 N.M. 626, 114 P.3d 306. "When language contained in a policy is unambiguous, we will not strain the words to encompass meanings they do not clearly express." *Gonzales v. Allstate Ins. Co.*, 122

4

N.M. 137, 141, 921 P.2d 944, 948 (1996). Contractual provisions in insurance policies must be interpreted in their usual, ordinary, and popular sense. *Battishill v. Farmers Alliance Ins. Co.*, 2006-NMSC-004, ¶ 8, 139 N.M. 24, 127 P.3d 1111.

**{12}**    The district court's interpretation of the term "sudden" was based on its conclusion that the term is ordinary and unambiguous. As authority for this conclusion, the district court cited and adopted the reasoning and holding of *Mesa Oil*, a Tenth Circuit case construing and applying New Mexico law to resolve a dispute over the applicability of a qualified pollution exclusion clause nearly identical to the one contained in the Allstate policies. *Mesa Oil*, 123 F.3d at 1339-41. As we explain below, *Mesa Oil* is factually analogous to the present matter and the Tenth Circuit's reasoning and analysis are persuasive.

**{13}**    Mesa Oil, an oil recycler, sought indemnification from its insurer for liabilities arising from the activities of a third party with which it did business. *Id.* at 1335. The third party had gradually and continuously discharged pollutants in the regular course of its business and, as a result of this conduct, Mesa Oil faced significant liabilities as a potentially responsible party under federal superfund law. *Id.* at 1335-36. Mesa Oil's comprehensive liability insurance "provided coverage for property damage or bodily injuries . . . subject to certain exceptions." *Id.* at 1335. One such exception was a qualified pollution exclusion which provided that Mesa Oil's insurance policy did not apply to "bodily injury or property damage arising out of the discharge [of] . . . pollutants." *Id.* at 1336. As is the case in the present matter, the pollution exclusion clause in Mesa Oil's policies contained a "sudden and accidental" exception which stated that the "exclusion does not apply if such discharge . . . is sudden and accidental." *Id.* Mesa Oil and its insurer disputed the meaning of the terms "sudden" and "accidental" and the applicability of the exception. *Id.* at 1336-37.

**{14}**    The Tenth Circuit resolved the dispute in favor of the insurer, concluding that the exclusion applied, that the "sudden and accidental" exception to the exclusion was inapplicable, and that Mesa Oil was not entitled to coverage for the liabilities for which it sought coverage. *Id.* at 1339-41. This conclusion was based on the court's assessment of how a New Mexico court would interpret the terms "sudden" and "accidental" and on the fact that Mesa Oil's liabilities derived from gradual and ongoing pollution discharges. *Id.* at 1336, 1339-41. The Tenth Circuit explained that "[w]hen an insurance policy is unambiguous, New Mexico courts will not strain the words to encompass meanings they do not clearly express." *Id.* at 1340 (internal quotation marks and citation omitted). The Court concluded that the term "sudden" is unambiguous and clearly expresses a meaning of quickness or abruptness and encompasses a temporal component. *Id.* As applied, the exception to the exclusion was inapplicable as gradual pollution is not sudden. *Id.* We agree with the Tenth Circuit's assessment of New Mexico law and its conclusions regarding the meaning of the term "sudden."

## C.    Ambiguity

**{15}**    UNC has submitted a number of arguments to support its contention that the term "sudden" is ambiguous and that the district court erred in failing to acknowledge as much.

5

The dissent agrees with these arguments and accepts UNC's position that the term is ambiguous. We are not persuaded. Before we examine those arguments, we observe that the district court admitted substantial extrinsic evidence to evaluate the question of ambiguity. Indeed, it is this very evidence which UNC cites as the basis for its arguments.

{16}    UNC first points out that there are multiple definitions of the term "sudden" in dictionaries. However, the fact that various definitions of a term can be found in dictionaries does not suffice to create ambiguity. *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1193 (3d Cir. 1991), *abrogated on other grounds by Northern Ins. Co. of N.Y. v. Aardvark Assoc., Inc.*, 942 F.2d 189, 193 (3d Cir. 1991); *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 702 F. Supp. 1317, 1324 (E.D. Mich. 1988).

{17}    Second, UNC emphasizes that there is disagreement about the meaning of the term "sudden" in jurisdictions which have interpreted "sudden and accidental" clauses like the one at issue here. This Court has previously recognized that "[a] split in legal authority may be indicative of an ambiguity in the policy, but does not establish one." *Davis v. Farmers Ins. Co. of Ariz.*, 2006-NMCA-099, ¶ 7, 140 N.M. 249, 142 P.3d 17. We are guided here by New Mexico case law on contract interpretation, not the conclusions reached by other courts in other jurisdictions. As described above, plain and ordinary terms are given their usual meanings and we do not "strain or torture the language of an insurance policy to create an ambiguity." *State Farm Mut. Auto. Ins. Co. v. Luebbers*, 2005-NMCA-112, ¶ 9, 138 N.M. 289, 119 P.3d 169 (internal quotation marks and citation omitted).

{18}    Third, UNC argues that, unless the term "sudden" is interpreted in the manner UNC proposes—as synonymous with the term "unexpected"—Allstate's policy is "hopelessly conflicting in purpose and scope." We disagree with this overly broad assertion. Under the interpretation we adopt, the exemption to the pollution exclusion clause would restore coverage for pollution that is both abrupt and accidental. This interpretation does not render the pollution exclusion clause hopelessly conflicting. Rather, we are far more troubled by UNC's contention that "sudden" is synonymous with "unexpected." Were we to adopt this view, the exemption would be needlessly redundant: the exemption would restore coverage for unexpected accidents. *See Mesa Oil*, 123 F.3d at 1340 ("The word 'sudden' clearly expresses a meaning of quickness or abruptness, particularly in light of the fact that it would be entirely redundant when paired with the word 'accidental' if it merely meant 'unexpected.'"). By definition, all accidents are "unexpected." Our rules of contract construction preclude us from construing language in a manner that creates such redundancies. *Rummel*, 1997-NMSC-041, ¶ 27.

{19}    Finally, UNC relies on the drafting history of the qualified pollution exclusion and the insurance industry's definition of the term "sudden" as grounds for the contention that the term is ambiguous and summary judgment wrongly granted. However, as we explain below, our well defined rules of contract interpretation do not allow us to delve into the drafting history or the insurance industry's understanding of the term.

{20}    When interpreting terms within insurance policies "our focus must be upon the objective expectations the language of the policy would create in the mind of a *hypothetical*

*reasonable insured*, who, we assume, will have limited knowledge of insurance law." *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 2002-NMCA-054, ¶ 7, 132 N.M. 264, 46 P.3d 1264. "Specialized knowledge of the insurance industry case law, academic treatments, and industry norms or standards should not enter into the inquiry." *Berry v. Fed. Kemper Life Assurance Co.*, 2004-NMCA-116, ¶ 61, 136 N.M. 454, 99 P.3d 1166. UNC and the dissent err to the extent they emphasize and rely upon the drafting history of the pollution exclusion clause and the insurance industry's understanding of terms therein. As stated, our point of reference is the hypothetical reasonable insured. The hypothetical reasonable insured with limited knowledge of insurance law would understand the word "sudden" to mean what it ordinarily means: quick, abrupt, or a temporarily short period of time.

**{21}** As we stated previously, the primary goal in contract interpretation is to ascertain and enforce the intent of the parties. *Ponder*, 2000-NMSC-033, ¶ 11. The starting point in determining the parties' intent is the plain language of the agreement and the ordinary meaning of any unambiguous terms therein. *See Battishill*, 2006-NMSC-004, ¶ 13 (concluding that, when the terms used in an insurance policy have a common and ordinary meaning, that meaning controls in determining the intent of the parties); *see also Gonzales*, 122 N.M. at 140-41, 921 P.2d at 947-48 (adopting the plain meaning of the term "bodily injury" for purposes of interpreting an insurance policy and observing that courts will enforce the plain language of insurance contracts and will not strain the meaning of words where they are otherwise clear); 2 Steven Plitt et al., *Couch on Insurance* § 21:1 (3d ed. 2010) (describing the analytical steps courts take in ascertaining the meaning of terms and conditions in an insurance policy and stating that a court will first determine whether the terms at issue are defined in the policy or have a meaning that is plain on its face). In our view, UNC and the dissent incorrectly bypass this crucial step and err in doing so. We need not rely on extrinsic evidence to define a term that has a readily discernible and plain meaning. As the Tenth Circuit recognized in *Mesa Oil*, we will not strain to define "sudden," which we conclude is an ordinary and unambiguous word. 123 F.3d at 1340. We reject UNC's assertion that the district court erred in defining the term "sudden."

**D.     Estoppel**

**{22}** UNC next contends that Allstate is estoped from asserting that the Allstate policies do not cover gradually occurring environmental liabilities. UNC dedicates only two pages of its brief-in-chief and two pages of its reply brief to this issue. In our view, UNC has failed to adequately explain this argument. UNC failed to identify the elements of a claim for regulatory estoppel or explain how it is applicable here. Rather, UNC merely argues that courts in other jurisdictions have applied estoppel under similar circumstances. This line of argument is insufficiently specific. *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (asserting that the appellate courts of New Mexico need not entertain inadequately developed arguments).

**E.     The Scope of the Matters Raised by the Parties**

**{23}** UNC argues that the district court improperly ruled on fact issues not raised by the parties on summary judgment and, in so ruling, violated UNC's due process rights.

7

Specifically, UNC argues that the district court erroneously concluded as a matter or law that UNC engaged in "bad business practices." UNC also argues that the district court failed to "consider the language in the underlying [Travelers] policies on summary judgment." We address those two issues in order.

{24} The district court did not conclude as a matter of law that UNC engaged in bad business practices. The district court referenced UNC's business practices in the course of addressing UNC's contention that the term "sudden" must mean unexpected and not quick or abrupt because Allstate was aware of UNC's activities and nonetheless chose to insure UNC. The district court responded that this contention was implausible because, in the district court's view, no insurer would issue insurance coverage for "bad" business practices which are known to be insurance liabilities. Moreover, this argument has no bearing on whether a genuine issue of material fact precludes summary judgment.

{25} Turning to UNC's second argument, UNC claims that certain provisions in a Travelers Insurance policy that underlies the Allstate policies "create additional questions of fact." As Allstate points out, UNC failed to submit the Travelers insurance policies into the record proper and has not cited the actual provisions this argument is premised on. UNC instead relies on an expert's description of the provisions in the Travelers policy and another single page document that Allstate describes as a 1981 Travelers underwriting pricing guide. "Where the record on appeal is incomplete, the ruling of the [district] court is presumed to be supported by the evidence." *Michaluk v. Burke*, 105 N.M. 670, 676-77, 735 P.2d 1176, 1182-83 (Ct. App. 1987).

{26} A court may grant summary judgment sua sponte so long as there are no genuine issues of material fact in dispute. *Martinez v. Logsdon*, 104 N.M. 479, 483, 723 P.2d 248, 252 (1986). In the context of deciding the motion for partial summary judgment, the district court concluded that no genuine issues of material fact existed and that its decision was conclusive as to UNC's entitlement to coverage under the Allstate policies. We see no error in this ruling and no violation of UNC's due process rights.

## F. Duty to Defend

{27} Finally, UNC argues that the district court's dismissal of its claims against Allstate deprived UNC of a fair hearing on Allstate's duty to defend UNC. The insurance policies provide "that with respect to any Occurrence covered only by the terms and conditions of this policy . . . [Allstate] shall defend any suit against [UNC] alleging such injury, sickness, disease[,] or destruction and seeking damages on account thereof[.]" However, an insurer does not have a duty to defend the insured if the injured party's allegations "clearly fall outside the provisions of the policy." *Bernalillo County Deputy Sheriffs Ass'n v. County of Bernalillo*, 114 N.M. 695, 698, 845 P.2d 789, 792 (1992). UNC's allegations clearly fall outside the scope of the policy as the activities for which UNC sought coverage are excluded from coverage and are not both sudden and accidental.

## III. CONCLUSION

8

**{28}** We affirm the district court's summary judgment order and remand the case for proceedings consistent with this opinion.

**{29}** **IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Chief Judge**

**I CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

**MICHAEL E. VIGIL, Judge (dissenting)**

**VIGIL, Judge (dissenting).**

**{30}** In my opinion, the majority overlooks the proper role of a court in determining whether a contractual term is ambiguous, and our role in determining whether summary judgment was properly granted by the district court. The question presented in this case is whether the phrase "sudden and accidental" in the insurance policies is ambiguous. Evidence that the phrase is ambiguous has several sources in the record. Nevertheless, the majority chooses to ignore the evidence and proceeds to decide the disputed issues of fact as an issue of law.

**BACKGROUND**

**{31}** UNC operated five mines from which it extracted uranium and mercury over the course of many years in the 1970s and 1980s. Three of the mines are under remediation pursuant to the federal Superfund Law, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), and 42 U.S.C. §§ 9601 to 9675 (2002). The two remaining mines are being remediated under the state counterparts to CERCLA, the New Mexico Mining Act, NMSA 1978, §§ 69-36-1 to -20 (1993, as amended through 2001), and the New Mexico Water Quality Control Commission (WQCC) Regulations, 20.6.2.4101 to .4120 NMAC (12/1/95, as amended through 1/15/01). Under CERCLA, liability of an operator such as UNC is said to be retroactive, strict, and joint and several, _see_ James F. Berry & Mark S. Dennison, _The Environmental Law and Compliance Handbook_, § 9.2.2, at 378 (2000). Consequently, liability for environmental contamination remediation costs may be imposed upon a mine operator years after operations have ceased, even if it intended no environmental harm and adhered to all applicable legal requirements and good mining practices.

**{32}** The language of the insurance policies differs slightly. However, they all agree to indemnify UNC for sums it is obligated to pay for property damages caused by or arising out

9

of an "occurrence." The definition of an "occurrence" is also slightly different in the policies, but they all include in its definition an accident or event "including continuous or repeated exposure to conditions" resulting in property damage that is "neither expected nor intended from the standpoint of the Insured." However, each policy also includes a "qualified pollution exclusion" stating that the policy shall not apply to

> Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but *this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental*[.]"

(Emphasis added.)

**{33}**    UNC filed a jury demand, thereby invoking its constitutional right for a jury to decide all disputed issues of fact. *See* N.M. Const. art. II, § 12 (stating the right to a jury trial "as it has heretofore existed shall be secured to all and remain inviolate"); *Blea v. Fields*, 2005-NMSC-029, ¶ 1, 138 N.M. 348, 120 P.3d 430 (stating it is the province of the jury to decide disputed facts that are material to a legal claim). "Summary judgment is a drastic remedial tool which demands the exercise of caution in its application. . . . Where an appeal is taken from an order granting summary judgment, the reviewing court will assess the record in the light most favorable to support a trial on the merits." *Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 231, 836 P.2d 1249, 1252 (Ct. App. 1992) (citations omitted). Under this standard, the summary judgment record establishes that the phrase "sudden and accidental" is ambiguous. UNC is therefore constitutionally entitled to have a jury decide its meaning.

**Determining Ambiguity**

**{34}**    In determining the existence of an ambiguity, we consider the language at issue "from the standpoint of a reasonably intelligent layman, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, prior to and contemporaneous with the making of the policy." *Rummel*, 1997-NMSC-041, ¶ 19 (quoting 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:14 (3d ed. 1996)). So considered, a provision within an insurance policy is ambiguous when it is susceptible to more than one meaning. *Id.* A policy which may reasonably be construed in different ways should be construed in favor of the insured. *Battishill*, 2006-NMSC-004, ¶ 17.

**{35}**    We no longer look only to the four-corners of a contract to determine whether an ambiguity exists. *C.R. Anthony Co.*, 112 N.M. at 508-09, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance."); *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (stating it was error for the district court to rely only on the four corners of the agreement to determine if

10

it was ambiguous). Even when language appears to be clear and unambiguous, the court may hear evidence of the surrounding facts and circumstances to decide if the meaning of a term or expression within the agreement is actually unclear. *Id.* If, in light of that evidence, the contract is susceptible to differing constructions an ambiguity exists, and the fact finder decides the meaning of the term or expression. *Id.* Moreover, if the evidence that is presented is itself disputed, turns on witness credibility, or is subject to differing inferences, the fact finder must resolve those issues. *Id.*; *Twin Forks Ranch, Inc. v. Brooks*, 120 N.M. 832, 835-36, 907 P.2d 1013, 1016-17 (Ct. App. 1995).

**{36}** The district court concluded that the word "sudden" and the word "accidental" in the qualified pollution exclusion "are clear and unambiguous and should be given their plain meaning and be construed in their usual and ordinary sense." As such, the district court found that the word "sudden" means "quick, abrupt or otherwise a temporarily short period of time," and that the word "accidental" means "unintended, unexpected or by chance." The district court therefore concluded that the policies do not apply "because the discharge of UNC was not sudden and accidental, and UNC has no coverage under the terms of said policies exclusions." The district court explicitly adopted these definitions from *Mesa Oil*. Under the *Mesa Oil* interpretation, which the majority also agrees with, "pollution must occur quickly or abruptly before the exemption [and thus coverage] will apply." 123 F.3d at 1340.

**{37}** At first glance, it may appear obvious that the word "sudden" excludes ongoing or gradual events, such as the pollution in this case. Indeed, as I discuss more fully below, one meaning of "sudden" is "quick" or "abrupt." However, I am not persuaded that "sudden" is limited solely to its temporal connotation. Our rules of contract interpretation lead me to the conclusion that "sudden" as used in the policies is susceptible to various meanings and is therefore ambiguous.

**{38}** I first place the qualified pollution exclusion in context by reviewing its drafting history. I also discuss the prior use and interpretation of the phrase "sudden and accidental" in other types of insurance policies. Next, I examine the plain meaning of the term and analyze the term in the context of the entire policy. Finally, I note the wide disagreement on this issue in other jurisdictions. This examination leads me to the inescapable conclusion that the phrase "sudden and accidental" in the qualified pollution exclusion is ambiguous.

**Drafting History**

**{39}** Allstate contends that the drafting history proffered by UNC is irrelevant because it is not related to the facts and circumstances surrounding the execution of the insurance policies between UNC and Allstate. However, I reject Allstate's argument that the drafting history, well-documented and submitted to us in the record, is completely irrelevant. UNC provided numerous industry drafting documents including internal insurance industry correspondence and representations to state insurance regulators. UNC has also cited to cases and law review articles that have considered and evaluated the drafting history of the qualified pollution exclusion. I consider the drafting history of the qualified pollution exception because it provides (1) context for the creation and intent of the term on the part

11

of the insurance industry, and (2) insight into whether the term is ambiguous.

{40}    The events leading up to the creation of the pollution exception by the insurance industry are "well-documented and relatively uncontroverted." *Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am.*, 629 A.2d 831, 848 (N.J. 1993). Numerous courts and commentators have traced the history of the pollution exception. *See, e.g., id.* at 848-55 (discussing the insurance industry's representations of qualified pollution exclusion to state regulators); *see also Alabama Plating Co. v. U.S. Fid. & Guar. Co.*, 690 So. 2d 331, 335-36 (Ala. 1996) (same); *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 882 P.2d 703, 717-18 (Wash. 1995) (en banc) (discussing history of qualified pollution exclusion); Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 622-27 (1990) (same); Carl A. Salisbury, *Pollution Liability Insurance Coverage, The Standard-Form Pollution Exclusion, and the Insurance Industry: A Case Study in Collective Amnesia*, 21 Envtl. L. 357, 363-86 (1991) (same); Sharon M. Murphy, Note, *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Environmental Liability*, 45 Vand. L. Rev. 161, 165-72 (1992) (same).

{41}    Prior to 1966, a typical comprehensive general liability policy provided coverage for bodily injury and property damage "caused by accident." *Morton*, 629 A.2d at 849 (internal quotation marks omitted). Such policies included insuring language similar to the following: "[The Insurer agrees t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, *caused by accident.*" *Moffat v. Metro. Cas. Ins. Co. of N.Y.*, 238 F. Supp. 165, 167 (M.D. Pa. 1964) (emphasis added) (internal quotation marks omitted). However, "accident" was not defined in the standard form policy and it was interpreted by some courts as an "unintended, sudden, unexpected event" which could include ongoing events. Ballard & Manus, *supra*, at 623; *see also id.* n.51 (compiling cases in which "accident" could encompass ongoing events); *Morton*, 629 A.2d at 849 (same).

{42}    In 1966, the insurance industry changed its standard form policy and replaced "accident" based coverage with "occurrence" based coverage. *Queen City Farms*, 882 P.2d at 717; *see Morton*, 629 A.2d at 849; Salisbury, *supra*, at 363-64. Under an "occurrence" based policy, an insurer provides coverage for "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damages that was neither expected nor intended from the standpoint of the insured." Ballard & Manus, *supra*, at 624 (internal quotation marks and citation omitted). According to commentators, this revision served multiple purposes:

> [I]t explicitly recognized that coverage was provided for all accidents so long as the insured did not expect or intend to cause damage. Second, ["occurrence" based coverage] clarified that covered property damage must be 'neither expected nor intended from the standpoint of the insured' since a number of earlier court decisions had held that 'accidental' should be construed from the perspective of the injured party.

12

*Id.* (internal quotation marks and footnote omitted). "The 1966 revision . . . was generally understood to cover pollution liability that arose from gradual losses." *Morton*, 629 A.2d at 849 (internal quotation marks and citation omitted).

**{43}** UNC submitted the affidavit of Mr. Richard E. Stewart in opposition to Allstate's motion for summary judgment. He is an expert in the insurance business and insurance regulation with over twenty-three years of experience. In his analysis of the drafting history of the qualified pollution exclusion, he states: "While coverage for gradual injury from pollution was unclear and arguable under the earlier 'accident' policy, the occurrence policy, triggered by damage, was acknowledged—indeed designed—to cover exactly such continuing injuries."

**{44}** The insurance industry introduced the qualified pollution exception in the early 1970's. *Queen City Farms*, 882 P.2d at 717. The court in *Morton* noted that the insurance industry had various motivations for creating the exclusion. 629 A.2d at 850 (noting possible reasons for the qualified pollution exception included concern that "occurrence" based policies extended coverage to most pollution situations; increased concern about pollution claims to environmental catastrophes; concern over public reaction to environmental pollution; a desire to clarify and publicize that the policies did not indemnify knowing polluters). However, the overriding purpose of the exclusion was to "deny coverage to intentional polluters." *Id.* at 875.

**{45}** Insurers set out to acquire the requisite approval from state regulators for the qualified pollution exception. In this connection, UNC's expert, Mr. Stewart, states:

> The insurance laws of most states require the filing of new policy language to be accompanied by an explanatory memorandum, setting out the reasons for and the intended meaning of the new provision[. However, the] standard explanatory memoranda say nothing about any intent to restrict coverage significantly in any way, nor do they warn of any intent to change the coverage provided in terms of the duration or other time dimension of the harm or the event causing it.
> On the contrary, the memoranda and other contemporaneous public statements by the bureaus and insurers suggest that the essential purpose of the endorsements was only to make clear that the insurers did not mean to cover intentional destruction of the environment.

A typical explanatory memorandum sent to regulators stated:

> Coverage for pollution or contamination is *not provided in most cases under present policies* because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above [qualified pollution exclusion] *clarifies* this situation so as to avoid any question of intent. Coverage is *continued* for pollution or contamination caused injury when the pollution or contamination results from an accident.

*See also* Ballard & Manus, *supra*, at 626 (same).

**{46}**    We have also been provided with correspondence between Insurance Company of North America and the New Mexico Superintendent of Insurance, requesting approval of the qualified pollution exclusion.  Insurance Company of North America offered the following explanation for the exclusion:  "[T]he policy, with [the qualified pollution exclusion], will not respond for such damage caused by the discharge or escape of any other pollutants or contaminants, unless such discharge or escape results from a sudden happening, during the policy period, neither expected nor intended from the standpoint of the insured."  The Department of Insurance requested further explanation because of its "impression that such coverage now exists under the present policy provisions and that the elimination of such coverage would constitute a restriction of policy benefits."  Insurance Company of North America responded:  "[C]overage would continue in cases where the pollutant or contaminant released is the result of a sudden happening which the insured did not expect or intend.  We believe that we should not afford coverage when conditions that are known to an insured as causes of pollution are permitted to continue."

**{47}**    The end result of the insurance industry's representations has been documented. *See New Castle County*, 933 F.2d at 1198 ("That insurers publicly marketed the exclusion as a clarification, rather than a restriction of coverage, further indicates that 'sudden and accidental' may mean . . . unexpected and unintended.  At the very least, we think that such comments on the part of the insurers corroborate the [c]ounty's claim that the phrase is ambiguous."); *Just v. Land Reclamation, Ltd.*, 456 N.W.2d 570, 575 (Wis. 1990) ("Contemporaneous representations by the insurance industry confirm that the drafting committee, in creating the exclusionary clause, clarified but did not reduce the scope of coverage.").

**{48}**    Thus, the insurance industry made representations to state regulators in the drafting history that conflict with the position that Allstate now makes, that "sudden and accidental" unambiguously means only "quick" or "abrupt."  I do not agree that insurance companies can represent to regulators that they intend a phrase to mean one thing in a policy when they seek its approval, then assert that it means something else when a claim is subsequently filed.  UNC's description of the drafting history of the qualified pollution exclusion supports a reasonable alternative interpretation to that now advocated by Allstate, and which the majority accepts as a matter of law.

**{49}**    Allstate offers a different version of the drafting history of the pollution exclusion. *See* Zampino, Cavo, & Harwood, *Morton International: The Fiction of Regulatory Estoppel*, 24 Seton Hall L. Rev. 847 (1993); *see also Charter Oil Co. v. Am. Employers' Ins. Co.*, 69 F.3d 1160, 1167 (D.C. Cir. 1995) (holding that the historical evidence proffered by the insured did not suggest any material inconsistency between the representations made by the insurance industry and the proposition that "sudden" cannot mean "gradual").  According to Allstate, the affidavits of some state insurance regulators collected by Zampino, Cavo, and Harwood in their law review article declare that they were not led to believe that the pollution exclusion would cover gradual, ongoing pollution.  Zampino et al., *supra*, at 896-919.

**{50}** I do not endeavor to resolve this apparent conflict, except to note that "[n]early every court that has relied on the regulatory history and other historical insurance industry documents relating to the scope and effect of the pollution exclusion has held that the exclusion bars coverage only for pollution that was deliberately caused." Eugene R. Anderson, Jordan S. Stanzler & Lorelie S. Masters, *Insurance Coverage Litigation* § 15.06[E] (2d ed. 2009); *see also* Murphy, *supra*, at 168-72 (discussing drafting history from perspective of both the insurers and the insureds).

**{51}** I do not consider the drafting history as dispositive of the issue. However, the plethora of internal documents and representations made to state insurance regulators rebuts Allstate's assertion that "sudden and accidental" in the qualified pollution exception can only mean "abrupt" or "instantaneous." At the very least, the drafting history included in the record and referenced in other jurisdictions creates a reasonable level of doubt as to its meaning.

**Prior Use of "Sudden and Accidental" in Other Insurance Policies**

**{52}** At the time the insurance industry began using the term "sudden and accidental" in the qualified pollution exclusion, a number of courts had already interpreted "sudden and accidental" in the context of insurance policies for boilers and machinery. *See, e.g.*, *Alabama Plating Co.*, 690 So. 2d at 336 n.7 (compiling cases in which "sudden and accidental" applied to gradual events in boiler and machinery insurance policies); *Morton*, 629 A.2d at 863-65 (same). These courts construed "sudden and accidental" to mean "unexpected and unintended." *New Castle County*, 933 F.2d at 1198; *see also* 10A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 150:30, at 150-49 (3d ed. 2009) ("When coverage is limited to a sudden 'breaking' of machinery, the word 'sudden' should be given its primary meaning as a happening without previous notice, or as something coming or occurring unexpectedly, as unforeseen or unprepared for. That is, 'sudden' is not to be construed as synonymous with instantaneous." (footnotes omitted)).

**{53}** An insurer is presumed to know the judicial construction of a term when it uses that term in a different setting. *See Lopez v. Townsend*, 42 N.M. 601, 620, 82 P.2d 921, 933 (1938) ("The insurer will be taken to have appropriated the language . . . with a knowledge of the construction given it by the courts in [other types of] policies."). Courts have noted the insurance industry's prior use of "sudden and accidental" in boiler and machinery policies and concluded that the term is ambiguous in the context of the qualified pollution exclusion. *See Alabama Plating Co.*, 690 So. 2d at 336 ("Because the judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties, we hold that the sudden and accidental exception to the pollution exclusion clause provides coverage when the discharge, dispersal, release or escape of contaminants into the environment was unexpected and unintended." (internal quotation marks and citation omitted)); *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 923 P.2d 1200, 1217-18 (Or. 1996) ("As our foregoing discussion shows, the word 'sudden' as it is used in the pollution exclusions is susceptible to differing interpretations. This court's prior case law and contemporaneous understandings of the phrase 'sudden and accidental' lend

15

support to [the insured's] reading of that phrase."); *see also Queen City Farms*, 882 P.2d at 720 (discussing prior use of "sudden and accidental" in boiler and machinery policies).

**{54}** The insurance industry's prior use of "sudden and accidental" and the judicial interpretations of the phrase creates additional doubt that "sudden and accidental" is unambiguous.

**The Plain Meaning of "Sudden"**

**{55}** One indication of the usual, ordinary, and popular sense of a word may be found in a dictionary. *See Battishill*, 2006-NMSC-004, ¶¶ 8-9 (consulting the dictionary to ascertain meaning of "vandalism" and "arson"); *Levenson v. Mobley*, 106 N.M. 399, 402, 744 P.2d 174, 177 (1987) (referring to the dictionary to determine the plain meaning of "require").

**{56}** *Webster's Third New International Dictionary* provides multiple definitions of "sudden." For example, one definition is: "happening without previous notice or with very brief notice." *Webster's Third New Int'l Dictionary* 2284 (unabridged) (2002). Other definitions include, "coming or occurring unexpectedly" and "not foreseen or prepared for." *Id.* These definitions provide different, yet reasonable constructions of "sudden."

**{57}** The word can convey a sense of unexpectedness or unforeseeability, and it can also impart a short and quick temporal connotation. *See Queen City Farms*, 882 P.2d at 720 ("There is . . . wide recognition that various dictionaries define the word 'sudden' both as 'unexpected,' and in terms of connoting a temporal idea of abrupt, instantaneous, short in duration, or the like."); *Just*, 456 N.W.2d at 573 ("The very fact that recognized dictionaries differ on the primary definition of "sudden" is evidence in and of itself that the term is ambiguous."). As the court in *Claussen v. Aetna Casualty & Surety Company* noted:

> The definition of the word "sudden" as "abrupt" is also recognized in several dictionaries and is common in the vernacular. Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. But, on reflection one realizes that, even in its popular usage, "sudden" does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring.

380 S.E.2d 686, 688 (Ga.1989) (footnote omitted).

**{58}** I agree that multiple dictionary definitions do not necessarily, by themselves, render a term ambiguous; however, they can serve as an appropriate starting point for analysis. *See New Castle County*, 933 F.2d at 1194 ("Having consulted the dictionary, the [lower] court proceeded to consider other factors relevant to determining whether the word "sudden" is, in the context of [the] policies, ambiguous." (internal quotation marks omitted)).

16

**{59}**    The meaning of "sudden and accidental" cannot be determined in this case by considering only dictionary definitions of "sudden."

**Context of The Policy**

**{60}**    UNC argues that the insurance policies contain provisions that, when viewed as a whole, suggest that the policy intended coverage for continuing pollution.  For example, UNC submits that an additional coverage provision included in the 1978 insurance policy would cause a reasonable policy holder to believe that Allstate provided coverage for the potential liabilities at stake in this case:  "The policy does not apply to property damage caused by seepage, pollution or contamination unless . . . [s]uch seepage, pollution or contamination is caused by accident and results in property damage during the period of the policy."  According to UNC, a reasonable policy owner could conclude that all accidental "seepage, pollution or contamination" is covered whether it was abrupt or gradual.  I agree.

**{61}**    "Seepage" is the noun form of the verb "seep," which is defined as "to flow or pass slowly through fine pores or small openings: OOZE." *Webster's Third Int'l  Dictionary*, *supra*, at 2056.  When read together, providing coverage for seepage, which is by nature a slow and gradual process, while simultaneously reading the qualified pollution exclusion to encompass only a "quick" or "abrupt" temporal component seems inconsistent and adds to the ambiguity.

**{62}**    UNC also compares the qualified pollution exclusion with "occurrence," defined in the policies as an accident or event "*including continuous or repeated exposure to conditions*" resulting in property damage that is "neither expected nor intended from the standpoint of [UNC]."  (Emphasis added.)  UNC argues that if "sudden" is construed to mean "unexpected" or "unprepared for," the definition of occurrence and the qualified pollution exclusion serve a complimentary purpose, while a strictly temporal construction of "sudden" renders the policy internally conflicting.  On this basis, other courts have found these two clauses to appear inconsistent with each other. *See Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1092 (Colo. 1991) (en banc) ("If 'sudden' were to be given a temporal connotation of abrupt or immediate, then the phrase 'sudden and accidental discharge' would mean:  an abrupt or immediate, and continuous or repeated discharge.  The phrase "sudden and accidental" thus becomes inherently contradictory and meaningless." (citations omitted)); *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992) ("[The occurrence and qualified pollution exclusion clauses] work together to convey the intent of the parties that the policy's coverage would protect the insured from unexpected or unintended releases, including those that may have been continuous.").  These potential conflicts of meaning are further evidence of an ambiguity.

**Jurisdictions Are Divided on Whether "Sudden and Accidental" Is Ambiguous**

**{63}**    A division in legal authority may be considered as indicative of an ambiguity, *Davis*, 2006-NMCA-099, ¶ 7, and on the issue before us, there is a significant division of authority. *See Textron, Inc. v. Aetna Cas. & Sur. Co.*, 754 A.2d 742, 748 (R.I. 2000) ("[O]ur examination of the relevant cases from other jurisdictions reveals no clear majority among

state or federal courts concerning whether [sudden] entails a temporal element."). State and federal courts throughout the nation are divided on whether "sudden and accidental" in the qualified pollution exclusion is ambiguous. *See also Mesa Oil*, 123 F.3d at 1339-40 (collecting numerous cases illustrating the division in judicial authority); Claudia G. Catalano, Annotation, *Construction of Qualified Pollution Exclusion Clause in Liability Insurance Policy*, 88 A.L.R. 5th 493, §§ 3 to 7.5 (2001) (same). There is no clear majority approach. *See Textron, Inc.*, 754 A.2d at 748 ("Both sides claim to hold the majority view, but the numbers are close enough that any slight preponderance of one position over the other is not particularly meaningful.").

{64}    While I do not rely solely on the split in authority for my conclusion that "sudden and accidental" is ambiguous, the wide disagreement amongst courts throughout the country is suggestive of the inherent difficulty in ascribing a singular meaning to "sudden and accidental."

**Duty to Defend**

{65}    The insurance policies also provide: "It is agreed that with respect to any Occurrence covered only by the terms and conditions of this policy . . . [Allstate] shall defend any suit against [UNC] alleging such injury, sickness, disease or destruction and seeking damages on account thereof." UNC argues that the district court dismissal of its claims against Allstate despite the narrow motion for summary judgment deprived UNC of a fair hearing on Allstate's duty to defend UNC. I agree with UNC that the district court improperly dismissed its claim against Allstate alleging a duty to defend. An insurer does not have a duty to defend the insured only if the injured party's allegations "clearly fall outside the provisions of the policy." *Bernalillo County Deputy Sheriffs Ass'n*, 114 N.M. at 697, 845 P.2d at 791. Given the ambiguity I have identified in the policies, the allegations made by the parties in this case do not "clearly" fall outside the scope of the policy. Accordingly, UNC's claim alleging a duty to defend was improperly dismissed.

**Summary Judgment Was Improperly Granted**

{66}    In sum, I conclude that "sudden and accidental" is ambiguous and its meaning must be decided by the jury. In reaching this conclusion, I have discussed various factors to illustrate why the term is ambiguous without relying on any single one. However, after consideration of the entire matrix, I am left with the inescapable conclusion that "sudden and accidental" does not have only one meaning as a matter of law, and therefore do not find *Mesa Oil* persuasive or dispositive.

{67}    I would remand this case to the district court for a factual determination as to the meaning of "sudden and ambiguous" in the insurance policies. *See* UJI 13-825 NMRA (instructing the fact finder on resolving an ambiguity in a contract); *see also Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 10, 137 N.M. 80, 107 P.3d 520 ("The meaning of an ambiguous term is a question of fact."). Since the majority disagrees, I dissent.

_____
**MICHAEL E. VIGIL, Judge**

**Topic Index for** *United Nuclear Corp. v. Allstate Ins. Co.*, **Docket No. 29,092**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-ES | Estoppel |
| CP-SJ | Summary Judgment |
| | |
| **CN** | **CONTRACTS** |
| CN-AM | Ambiguous Contracts |
| CN-IN | Interpretation |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| | |
| **GV** | **GOVERNMENT** |
| GV-EN | Environmental Law |
| | |
| **IN** | **INSURANCE** |
| IN-BF | Bad Faith |
| IN-DC | Denial of Coverage |
| IN-DD | Duty to Defend |
| IN-EC | Exclusion Clause |
| | |
| **NR** | **NATURAL RESOURCES** |
| NR-MM | Mines and Minerals |
| NR-PO | Pollution |